(33 South. 918.)

No. 14,444.

HARRIS v. HARRIS. et al.*

(Jan. 5, 1903.)

FRAUD—SALE OF LAND—BONA FIDE PURCHASER—AGENT—RECOVERY OF LAND.

1. The charge urged by plaintiff that one of the defendants, Hubbell, combined to defraud her and influence her, through his codefendant, Judson Harris, to sell her land, in order to buy it himself, is not sustained by the proof.

2. Plaintiff, having placed the property claimed by her in the name of one of the defendants, in order to enable him to sell it for her account, cannot recover against an innocent third person who bought the property from this defendant.

3. It is not shown that the buyer from his codefendant had knowledge of any understanding between his codefendant and plaintiff. Judgment is affirmed as to the defendant who bought from one to whom plaintiff had intrusted her land as vendee.

4. In reference to the codefendant trusted by plaintiff, the facts and circumstances are different. Up to the date of the sale he had been the agent of plaintiff, and the sale was passed at his instance. better to enable him to sell the property.

That part of the property which was in this defendant's possession is to be delivered to plaintiff as her own, cum onere. The judgment as to this defendant is annulled, avoided, and reversed.

(Syllabus by the Court.)

Appeal from Judicial District Court, Parish of Calcasieu; Edmund Denis Miller, Judge.

Action by Lylie O. Harris against Judson Harris and another. Judgment for defendants, and plaintiff appeals. Modified.

Thomas H. Thorpe, Cline & Cline, and Winston Overton, for appellant. Leon Sugar, for appellee Judson Harris. Pujo & Moss, for appellee Frederick C. Hubbell.

BREAUX, J. This is an action of nullity to set aside two deeds of sale. Plaintiff owned two tracts of land, containing 1,840 acres, near Jennings, in the parish of Calcasieu, and a square of ground in that town. The residence of plaintiff and her husband was in that parish, on a place referred to in the testimony as the homestead.

A few years prior to the death of her husband, in 1900, he became quite ill, and had to remove to New Orleans to receive needed

*Rehearing denied March 16, 1903.

medical treatment, but retained the management of his affairs. After a time, as his physical condition did not permit him to go to his former home to see to his affairs, he placed his property in charge of a real estate firm, and afterwards in that of his son Judson Harris, who was the stepson of plaintiff; he being the issue of a former marriage of her husband.

The illness of Mr. Harris and the care of their four children took up all plaintiff's time and attention, and in consequence she could not attend to business in a distant parish.

Mr. Harris wrote to his son Judson Harris regarding the necessity of realizing a greatly needed amount, and urged him to mortgage his homestead or to sell some of his land. It appears that the property of plaintiff and that of her late husband were incumbered with mortgages. To his father, the son Judson answered that he could, he thought, obtain the amount needed. After some delay the father again wrote, expressing some displeasure because of the delay. To this the son, in answer, stated that he had found it impossible to obtain any amount; adding that the person from whom he expected to obtain a loan had disappointed him, that lands were cheap about Jennings, that there were no purchasers, and, further, that a recorded judgment operated as a hindrance to the sale of the land offered for sale.

Further on, in the year 1898, in another letter, Judson Harris wrote that the Watkins Land Company, holders of the mortgages on the land, were threatening to foreclose. He also said in this letter that there was a tenant on the place who would make a fair crop of rice. He advised that the rental be at once collected, in order to avoid payment pro tanto of this company's claim. This the father reprovingly declined to do, and said that he desired to treat this company with the utmost fairness.

The preponderance of the evidence shows that the Watkins Land Company notified Judson Harris (who was acting for his father) at different times of its anxiety to collect the amount of the claim it held. This company held mortgages on their land for a large amount—about $17,000.

It seems to have become generally known that the lands of plaintiff and her late hus-

band were for sale. About April, 1899, F. C. Hubbell, one of the defendants, a resident of Des Moines, Iowa (a capitalist), was in that parish, and was by a Mr. McFarland sufficiently drawn into the idea of buying these lands to induce him to go out and look at them, but at that time he (Hubbell) declined to buy. It seems that he was again in that parish in January, 1900, and it was then, we are informed, he met, for the first time, Judson Harris. In April following, Judson Harris sold the land in question (that is. the tract belonging to his father and that belonging to his stepmother) to defendant F. C. Hubbell for the price of $2,500.

We will have to go back a few months preceding the date of this sale to Hubbell, in order to state that plaintiff, with reference to these lands, said that her husband, W. H. Harris, in 1899, received a letter from Judson Harris informing him that he had been offered by defendant Hubbell $300 in cash for the land mentioned by her as the "Marais Tract," of which she was the owner, and for her square of land in Jennings, and that this purchaser wished to buy all of her father's land, also, in Calcasieu parish, for which he offered $1,200. Plaintiff swore that she and her husband were informed that this purchaser would not buy at all unless he could buy all the lands they owned; that he (Judson Harris) advised the sale, which her husband hastily declined, saying that he was surprised that so small a price should be offered, but that after exchanging several letters, being in need of money, and feeling that Judson Harris was their friend, and confident that he had done everything to help his father, who was greatly ill and in need, they consented to the sale. Judson Harris also wrote, she said, that the purchaser in view (Hubbell) would not buy directly from plaintiff, on account of the many judgments that were recorded against the property; that he (Hubbell) insisted that the property should be conveyed to him (Judson Harris), and that he (Judson Harris) would sell to him (Hubbell); that she and her husband, in order to close the sale, consented to place the title in the hands of Judson Harris, as requested.

A few days after they had complied with this request and had forwarded the deed, she testified that she received a check of $300 for her portion of the land, and her husband a check of $1,000 for his portion; that $200 were retained, she was told by Judson Harris, to pay a certain judgment, referred to as the Venable judgment. She charges that the amount retained was not sent in accordance with the promise, and caused her some annoyance, of which she complained to Judson Harris.

The deed to Judson Harris, to which plaintiff referred as a witness, was signed by her on the 4th day of December, 1899, and recorded in Calcasieu on the 11th of December, 1899; and the deed signed by Mr. William H. Harris was also signed on the same day, and recorded a few days later. The records disclose that on the 19th day of April, 1900, a few days after the death of W. H. Harris, Judson Harris sold, as before stated, the lands of plaintiff to his codefendant for the sum of $2,500. The buyer, Hubbell, immediately after the sale, went into possession, and commenced to improve the place.

The statement of facts shows that there was some delay on the part of Hubbell in having the deed of purchase recorded.

Taking up the statement of Judson Harris as a witness, it appears in the first place from it that, when he bought from his stepmother and his father, he was impressed with the belief that the Watkins Land Company, holder of the mortgages, intended to foreclose speedily. But in the course of his testimony he made a different statement; that is that he had bought from them (his father and stepmother) because he had almost certain promise of the agent of the Watkins Land Company that he by it would be given another year, and that he would in that time be able to effect a sale for his own account.

It does not, however, appear that he communicated to his father and stepmother that he held a promise, certain or uncertain, from the agent of their creditor, the Watkins Land Company. He further stated that he had no purchaser in view, but thought he would, perhaps, find some one who would buy, and thereby he would be enabled to make "something out of it," to quote literally from his testimony.

After all these transactions and sales, and

after some feeling had arisen, in a friendly letter he said to his brother-in-law, De Russy, that his father continued to write for money; that he could not get it for him; that he received a most appealing letter, urging him to sell and get the much-needed amount.

That it was then he received an offer from one who knew of their desperate condition. That the price offered was less than the land was worth, but, under the circumstances, he concluded to sell property which could not be easily sold—mortgaged, as it was, for about $15,750.

The following from the testimony of this witness shows that relations had become strained:

"Ans. No, sir. These repeated demands were so frequent that they became almost unbearable. He abused me and made me mad. It was then that I wrote him that letter—after he was not satisfied with my arrangement—that I would wash my hands of the whole thing, and have nothing more to do with it." Quoting further: "That was before the deed was made to me. It was some time in the early part of the fall, and I wasn't feeling very kindly over the matter, at all. I felt that, after all I had done, he would abuse me, thinking that I could sell the land, and wouldn't do it. I have been trying for five years to get money on the place."

In the letter to his brother-in-law, some time after the sale (i. e., in August, 1901), to which we have before referred, he said that, owing to the desperate condition of his father financially, he advised him to accept $300 for the homestead tract, and $1,200 for the Grand Marais tract, which was burdened with a mortgage.

He testified as a witness that the statement in this letter was erroneous and a mistake.

He advised plaintiff and his late father that he charged no commission for selling the land.

As relates to the fee of notary, he answered:

"Ques. Wasn't you making the sellers pay for these things?" (Notary fees.)

"Ans. I considered it was nothing but right, under the circumstances."

This witness further testified that he considered the sale to him by his father and stepmother as an absolute sale. It is part of the history of the case that in 1901 the defendant Hubbell, purchaser of the property as before mentioned, instituted suit against the Watkins Land Company, mortgage creditor, for the cancellation of the mortgages. He at the same time tendered $11,001 to pay the incumbrances.

It also appears that Herbert D. Thompson, a friend of Hubbell, who avers that he had paid, after the suit had been instituted, all of the Watkins Land Company's claim, intervened, alleging that he had bought these claims for the sum of $18,315.99. The plaintiff is a party to this suit. The suit itself is still pending in the district court.

A judgment obtained by the Garr-Scott Company against plaintiff and her husband in solido also enters in the issues of this case before us for decision. It also was bought by D. R. Thompson, and a short time afterward a writ of fieri facias was issued on this judgment. In executing this judgment, Judson Harris pointed out the property to be seized. At execution sale section 20 of the land in question was adjudicated to the defendant Hubbell for the sum of $6,500, of which sum the adjudicatee paid $1,243.46 in cash, and retained the balance in his hands to pay the mortgages on the property.

The record reveals that in June, 1901, Hubbell transferred 160 acres of section 20 to Judson Harris for the price of $1 in cash and $1,549 payable in two years from date of sale.

The adjudicatee, Hubbell, said, as a witness, that he transferred this tract to Judson Harris because, at the time of the sale of section 20 under the foreclosure of the Garr-Scott judgment, Rowson, the real estate agent by whom he was represented in the matter of this purchase, had agreed with Judson Harris that he (the buyer, Hubbell) and Harris would buy the section together— he (Harris) to own one-quarter interest, and Hubbell three-quarters, in the land; that the deed was executed to him; and that, as he was afterward informed by his agent of the agreement which he (the agent) had made, he deemed himself bound to transfer one-quarter interest to Harris at what it had cost him.

The judge of the district court rejected

plaintiff's demand. From the judgment, she appeals.

## Opinion.

Defendants have severed in their defense, and file separate answers. The suit against the defendant Hubbell will be considered first and decided. We have seen that he was entirely a stranger to the plaintiff, and we have not found that he participated in any of the acts assailed. No evidence leads to the conclusion that this defendant suggested to Judson Harris to buy the property in controversy.

It was not shown by the testimony that he was placed in possession of knowledge which prevented his becoming an owner in good faith.

He dealt with his vendor exclusively, and not directly or indirectly with the plaintiff, who was his vendor's vendor.

We do not find that any influence was brought to bear by this purchaser.

He had the right to consider plaintiff's vendee the owner of the property, and to trust the record of titles.

After having carefully reviewed the transactions between the defendant, we do not think it possible to carry inference to the extent of holding that the buyer deliberately defrauded the plaintiff, or that he committed an act, in a legal point of view, sufficiently detrimental to justify the court in setting aside the sale. He, as buyer of the property, paid a sum about equal to its value.

Had this defendant taken part in anything savoring of deceitful machinations, as is, in substance, charged, the testimony would, in all probability, disclose his interest, and wherein he had been in some way benefited. On the contrary, the evidence shows that he in no way was benefited by the price at which his vendor, Harris, bought from his stepmother, the plaintiff.

At the first appearance or view of the question, it may be thought that there is ground to presume that his vendor, Harris, must have come to an agreement with some one with capital (before he thought) to buy from him (Harris) in case he were to succeed in buying from his stepmother.

If there was such an agreement between Harris and any one, it does not appear that it was entered into directly or indirectly with the defendant Hubbell, or with his sanction. But seriously considering the shape in which the business was, there was no necessity on the part of Judson Harris of having or controlling a large amount in order to become the purchaser, and there was not the least necessity of finding a buyer beforehand, to come to the relief of Harris, provided, it was possible for him to pay, as vendee of plaintiff, the small amount of $300.

This was all that was necessary to become a third possessor of the property. This was all that Judson Harris paid when he became a third possessor. A few months after his purchase he found a purchaser (Hubbell) at a considerable profit on the amount which he had paid. Had he failed in this, the most that he could have lost would have been the amount before mentioned, paid by him as the price.

We repeat that there was really no necessity for an interposed person between plaintiff and any purchaser owning the amount of $300. It is true that Hubbell's name, perhaps, was mentioned by him to plaintiff.

If it was mentioned, nothing suggests the inference that he (Hubbell) authorized its use.

Plaintiff, on another ground of attack, urges that this defendant Hubbell was slow in placing his title on record; that his hesitation affords ground for the belief that he had cause to apprehend that there was ground to set the sales aside.

Hubbell was in open possession of the property from the day of sale. A few months' delay on his part in recording a title to property as incumbered as this was, creates no impression of attempt at concealment, under the circumstances. He had paid a fair price, and was in possession. The delay mentioned indicated, if anything, more confidence in the legality of his title than apprehension of its illegality.

It is true that this defendant had bought the property, and that the mortgages bearing upon it were bought (we are informed) by a friend of this defendant, and not by the defendant himself. Hubbell swears they were bought by D. B. Thompson on his (Hubbell's) request.

Although this act may be subject to some criticism, it is not one in any way injurious

to plaintiff, and of which she can complain, as it affords no ground to presume that there was collusion between Judson Harris and this defendant. D. B. Thompson, the owner of these mortgage claims, is a man of means. The evidence shows that he paid for the claims.

D. B. Thompson, owner of the Garr-Scott judgment, bought by him, as just stated, at the instance of Hubbell, executed it by having section 20 (plaintiff's land at one time) seized and sold. It was bought by Hubbell at the sheriff's sale.

We have carefully considered the suit brought by defendant Hubbell, owner of the land, against the Watkins Land Company, to reduce the amounts of its mortgages. The mortgage claims had the effect of clouding his title. He sought to have them judicially investigated, in order, we presume, to pay them.

There was energy manifested to reduce the amount of these mortgages. The defendants acted par nobile fratres, if these words can be quoted to characterize a business transaction of this sort. One (Hubbell) sought to pay as little as possible for his title, illustrating the old Latin adage, "Emptor emit quam minimo potest." The other (Harris), it seems, had some interest in the result. If there was an agreement between them, it was particularly directed against the Watkins Company, we think, and not against plaintiff, and the evidence is against the conclusion that there was any understanding prior to the date of the first sale attacked.

Another phase of the case is that Judson Harris has become the owner of a section of the land (i. e., of section 20) which was included in the number of acres embraced in the deed which his stepmother placed in his hands as before mentioned. This transfer by Hubbell to Harris was made some time after Hubbell became the owner. He (Hubbell) was not at the sale. When informed of an agreement entered into with his own agent, as before stated, he carried out its terms.

If, as before mentioned, Hubbell was an owner in good faith, these transactions subsequent to his purchase are not to be interpreted as indicating a pre-existing combination, so far as Hubbell is concerned, to wrongfully wrest plaintiff's title from her. The testimony shows that Hubbell enjoys an excellent reputation at home and in the parish of Calcasieu.

He is a young man of wealth—several times a millionaire, it seems. There is no accounting for a motive here to take advantage of plaintiff for the sake of owning a few hundred acres of land at about its value, when it appears that there were many acres at the time which could have been bought at about the same price an acre. His good character is shown. "Good character is oftentimes the only testimony which a defendant can oppose to suspicious circumstances." Greenleaf, vol. 1, § 54.

In dismissing this branch of the case from further consideration on this hearing, we desire to cite, without extended reference to the text, decisions which we consider as bearing upon the issues before considered: Foster's Heirs v. Foster's Adm'x, 11 La. 401; Blanchard v. Castille, 19 La. 362; Hunter v. Buckner, 29 La. Ann. 607.

In a case presenting issues very similar to those here (i. e., in Broussard v. Broussard, 45 La. Ann. 1085, 13 South. 699), the court quotes at length, and with entire approval, the utterances of the Supreme Court in Fletcher v. Peck, 6 Cranch, 133, 3 L. Ed. 162. The text quoted is very apposite, and therefore is inserted here: "If a suit be brought to set aside a conveyance obtained by fraud, and the fraud be clearly proved, the conveyance will be set aside as between the parties; but the rights of third persons, who are purchasers, without notice, for a valuable consideration, cannot be disregarded. Titles which according to every legal test are perfect are acquired with that confidence which is inspired by the opinion that the purchase is safe. If there be any concealed defect, arising from the conduct of those who had held the property long before he acquired it, of which he had no notice, that concealed defect cannot be set up against him. He has paid his money for a title good at law. He is innocent, whatever may be the guilt of others, and equity will not subject him to the penalties attached to that guilt. All titles would be insecure, and the intercourse between man and man would be very seriously obstructed, if this principle be overturned "

We think the judgment should be affirmed as to defendant Hubbell.

This brings us to a consideration of the case in so far as Judson Harris is concerned.

This defendant had been acting as agent of plaintiff up to the time the deed was passed, under circumstances which show, to our best thinking, that his action created the impression that he was selling to another, when in reality he was buying for himself. This purchase was nominally in his name, in order to effect a sale to some third person, but who that third person was does not seem to have been disclosed with any certainty. None the less, some third person was to buy.

This is the trend of plaintiff's testimony, admitted without objection, which receives confirmation from the text of the letter written by Judson Harris to his brother-in-law, to which we have referred in our statement of the facts. While, as agent, endeavoring to sell these lands for his father and stepmother, facts of some importance, connected with the possibility of selling, came to his knowledge.

It behooved him, under the law of agency, to inform these owners of those facts which were at all material, within his knowledge. This he neglected to do.

If he had informed them, and they had afterward sold to him, then the sale would have been valid. Dealing with this defendant in name only as a buyer, and as one through whom they were selling to another, they naturally reposed the greatest confidence in him, and had the right to view him in the light of one acting in all respects for them, and not for himself. The seller, in the order of business, seeks to obtain the highest price —fairly, of course—and the buyer seeks to buy at the lowest, consistent with fair dealing. The idea is clearly expressed in the Roman law: "Emptor emit quam minimo potest, venditor vendit quam maximo potest."

This is no longer the case if the adviser to sell, and one acting as agent, withholds knowledge which he should impart, and, without fully informing his principal, buys himself, under the guise that he is buying, better to enable him to sell to another.

The duty which this defendant owed to plaintiff and his father, under the circumstances, was adverse to his own interest, for he naturally sought to buy as cheaply as possible, while, on the other hand, they had the right, through him, to expect the highest price obtainable.

Under the circumstances disclosed, was it not the duty of the buyer, before buying, to expressly renounce all agency? Civ. Code, art. 3031. We have not found expression indicating such an intention on his part.

Was he not bound to complete this sale to a third person? Civ. Code, art. 3002.

Without renouncing the agency or notice of intention not to complete the transaction by selling to a third person, this defendant, in buying, was in an attitude, legally speaking, not sanctioned by the law of agency. It interposes a preventive check against all such acts.

Plaintiff, having placed the property in defendant's name, cannot recover against innocent third persons. She can recover against defendant, as he cannot be heard to claim the property under the circumstances.

She, however, must take the property cum onere.

It is therefore ordered, adjudged, and decreed, for reasons stated, that the judgment in favor of defendant Hubbell, appealed from, is affirmed, at plaintiff's costs.

It is further ordered, adjudged, and decreed, for reasons stated, that the judgment of the district court in favor of defendant Judson Harris be annulled, avoided, and reversed, at defendant Judson Harris' costs in both courts.

It is further ordered, adjudged, and decreed that plaintiff have and recover judgment for the tract of land, to wit, the northeast quarter of section 20, in township 9 south of range 3 west, cum onere; that she be placed in possession of this land.

It is further ordered, adjudged, and decreed that plaintiff have and recover judgment for rent of the land in question (now in possession of Harris) at the rate of $3 an acre per annum from the date of his purchase, viz., 24th day of June, 1901, to the date that plaintiff will resume possession of this tract.