(44 South. 481.)

No. 16,308.

JENNINGS–HEYWOOD OIL SYNDICATE v. HOUSSIERE–LATREILLE OIL CO. et al.

(March 4, 1907. On Rehearing, June 28, 1907.)

1. MINES AND MINERALS—OIL LEASE—CONSTRUCTION—DELAY—FORFEITURE.

Plaintiff, as transferee (through mesne conveyance) of the original lessee, sues for the enforcement of a contract whereby the owner of 40 acres of land, lying in a field and state from which no oil had ever been produced, and having a value of about $10 an acre, leased the same for the sole purpose of operating for oil and gas, for a term of ten years, or so long as oil or gas should be produced. The lessee agreed to begin operations within six months, or pay $50 quarterly in advance for each three months' delay, and to deliver to the owner the equivalent of one-eighth of the oil saved and of the gas marketed as royalty.

It was also stipulated that the lessee might, at any time, surrender and cancel the lease on payment of $100. This contract was duly recorded, and plaintiff's authors made three, and plaintiff one, payment for delay. The tender of the fourth payment was made after the date contemplated, and was refused, on the ground that the contract had been thereby forfeited. Thereafter, but before any steps had been taken to put it in mora, plaintiff began drilling a well on the leased property, when it was enjoined, and later brought this suit on the contract, to which defendants, claiming under the original owner and lessor, answer that the contract was

forfeited for nonperformance, that it was obtained by fraud, misrepresentation, and coercion, and that the consideration is vile and inadequate.

*Held*: (1) That, in the absence of any allegation connecting plaintiff with the fraud, misrepresentation, and coercion charged, the testimony offered in support of those charges was properly excluded.

(2) That our law does not favor forfeitures, and that the contract did not become ipso facto forfeited by reason of the failure of the lessee to drill, or pay on the day stipulated; such violation of the contract being passive.

(3) That the consideration, as expressed in the contract, is adequate for its support, both upon the face of the papers and in the light of the testimony.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mines and Minerals, § 206.]

On Rehearing.

2. SAME—DUTY OF LESSEE — OPTION — EXERCISE—BREACH OF COVENANTS—RESCISSION.

At the height of the excitement created by the discovery of oil at Beaumont, Tex., indications similar to those at the celebrated Spindle Top were observed at Prairie Mamou, about 90 miles from Beaumont, and it caused great excitement. Speculators began taking leases of the lands of the neighborhood, and a farmer leased to one of these speculators the part of his land in the immediate proximity of the oil indications. The lease was for ten years, and was declared to be for the sole purpose of operating for oil and gas, and its recited consideration was $1 and the engagement of the lessee to begin operations within six months, or pay $50 quarterly in advance for any delay in commencing operations, and to deliver to the lessor one-eighth of whatever oil or gas might be produced. The lessee reserved to himself the right to retire from the contract at any time on payment of $100. Just before the expiration of the six months the lessee made the first quarterly payment, and thereafter made two others in advance; but, when the time came for making the fourth, he overlooked it, owing to the fact that a fire was raging in the oil field. He tendered the payment four days late, and the lessor declined to receive it, claiming that the contract had been forfeited for nonperformance, and that the tender of the quarterly payment for further delay had not been made in advance as stipulated. The lessee did not even then offer to develop the land for oil, but insisted that he had the right to postpone doing so indefinitely on making quarterly payments of $50, and he continued to tender $50 quarterly to the lessor. When accepting those of the quarterly payments which he accepted, the lessor had insisted that the next well should be bored on his land, and at the time of the refusal of the fourth quarterly payment a number of wells had been bored in the immediate vicinity of the lessor's land, and, for all that was

known, were draining the lessor's land of its oil. The evidence shows that the cost of boring the well which the lessee obligated himself to bore within six months was about $10,000, and it also shows that at the signing of the contract the prospect of striking oil appeared to be excellent. Things continued in this state for eighteen months longer, when, the lessor having begun making preparations for exploiting the land himself, the lessee came upon the land, and litigation followed. *Held:*

(1) That since the sole object and purpose of the contract was to exploit the land for oil and gas, and the contract left the lessee at liberty to do so or not at his option, there was in reality no contract binding on the lessee.

(2) That if, however, there was a contract, it was either in the nature of an option to the lessee to begin operations within the time fixed in the contract, with the right to prolong the term on making quarterly payments in advance, or else it was a commutative contract, wherein the obligation was to exploit the land for oil and gas. If it was the former, it came to an end by the lessee not exercising the option timely. If it was the latter, the lessee broke it by neither beginning operations nor offering to do so within the term of the contract or within a reasonable time thereafter.

(3) That, even if the obligation of the lessee was alternative, namely, either to exploit the land for oil and gas or else to pay $50 in advance quarterly, it became pure and simple when the alternative right to make the payments vanished from the contract as the result of failure to exercise that right in time; and from that time the only useful offer of performance the lessee could have made would have been to develop the land for oil and gas.

(4) An option must be exercised within the time limit, or the right will be lost. Even vis major is no excuse for delay.

(5) If a lease is made in consideration of a payment to be made in advance, the obligation of the lessor does not come into existence unless the payment is made in advance. The payment in advance is a suspensive condition, or condition precedent.

(6) Where the contract has been violated by not doing what was covenanted to be done within the time stipulated, a putting in default is not a prerequisite to a suit in rescission. Such putting in default is a prerequisite only to the recovery of future damages.

(7) When the contract has been violated by the obligor, the obligee, who no longer desires that it should be performed, is not bound to put the obligor in default or to bring suit for rescission, but may refuse to allow the contractor to perform, and, in case of suit by the contractor, may plead the breach of the contract by way of exception.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Mines and Minerals, §§ 168, 204–211.]

Breaux, C. J., and Monroe, J., dissenting.

(Syllabus by the Court.)

Appeal from Eighteenth Judicial District Court, Parish of Acadia; Philip Sidney Pugh, Judge.

Action by the Jennings-Heywood Oil Syndicate against the Houssiere-Latreille Oil Company and others. From the judgment, both plaintiff and the above-named defendant appeal. Judgment set aside, plaintiff's suit dismissed, and defendant's reconventional demand for damages dismissed.

See 42 South. 930, 118 La. 262.

Chappuis & Holt and Gregory & Batts, for plaintiff. D. Caffery & Son, J. Sully Martel, Francis Liddell Richardson, Frank Soule, and Hampton Story (Kenneth Baillio, Edward Nicholls Pugh, and Farrar, Jonas & Kruttschnitt, of counsel), for defendant. L. A. Carlton and Joseph Sidney Wheless, amici curiæ.

## Statement of the Case.

MONROE, J. Arthur Latreille and S. A. Spencer having entered into a certain contract, Spencer assigned his rights therein to S. A. Spencer & Co., by whom they were assigned to plaintiff, and plaintiff brings this suit for their enforcement. The contract in question is set forth in the petition, and contains, among others, the following stipulations, to wit:

"That the party of the first part, * * * in consideration of the sum of one dollar, to him paid, * * * and of the covenants and agreements hereinafter contained, * * * has granted, leased, and let * * * unto the said party of the second part, its successors and assigns, for the sole and only purpose of mining and operating for oil and gas, laying pipe lines, and building tanks, stations, and structures thereon, to take care of said products, all that certain tract of land, situated in Acadia parish, * * * described substantially as follows: West, by Jules Clement and Orange Land Company; north by Arnaudet; east, by lessor; and south, by Houssiere—containing 40 acres, more or less, * * * reserving, however, therefrom 100 feet around the buildings, on which no well shall be drilled. * * * It is agreed that this lease shall remain in force for the term of ten years from this date and as long thereafter as oil or gas, or either of them, is produced therefrom by the party of the second

part, its successors and assigns. In consideration of the premises, the party of the second part covenants and agrees: First, to deliver to the credit of the party of the first part, his heirs and assigns, free of cost, in the pipe line to which it may connect its wells, the equal one-eighth part of all oil produced and saved from the leased premises; and, second, to pay one-eighth of all the gas from each and every well drilled on said premises, the product from which is marketed and used off said premises. * * * Second party covenants and agrees to locate all wells so as to interfere as little as possible with the cultivated portions of the farm, and, further, to commence operations on said premises within six months from date hereof, or pay at the rate of $50 quarterly in advance for each three months such operation is delayed until such well is completed; and it is agreed that the completion of such well shall be and operate as a full liquidation of all rental under this provision during the term of this lease. It is agreed that the second party is to have the privilege to use sufficient water from said premises to run all necessary machinery and fixtures placed on said premises, and, further, upon payment of $100 at any time by the party of the second part, its successors and assigns, to the party of the first part, his heirs or assigns, said party of the second part, its successors or assigns, shall have the right to surrender this lease for cancellation, after which all payments and liabilities thereafter to accrue under and by virtue of its terms shall cease and terminate, and this lease become absolutely null and void."

Plaintiff, by original and amended petitions, alleges that it and its authors have complied with the obligations thus assumed by them; that, not having commenced operations within six months from the date of the contract, they, on October 19, 1901, paid Latreille the sum of $50 as the quarterly rental in advance, and made like payments on January 19 and April 19, 1902; and that its tender of $50 on or about July 19, 1902, was declined for no sufficient reason. It further alleges that on December 6, 1901, the Corkran Oil & Development Company instituted suit against Latreille and others, praying to be decreed the owner of the land in question; that the judgment in favor of defendants did not become final in the Supreme Court of the state until November, 1903, and was then taken by writ of error to the Supreme Court of the United States, where the suit is still pending, for which

reason, in addition to those given, plaintiff was legally justified in delaying active operations under its contract, but that, promptly after said suit had been decided by the Supreme Court of the state, it erected a derrick on the leased land, with the bona fide intention of drilling for oil and gas, and was engaged in that work when, on January 15, 1904, it was enjoined by defendant from further prosecuting the same and from entering upon the premises, and that, though the injunction was ordered by the court to be dissolved, it was nevertheless kept in force by a suspensive appeal from the order of dissolution, which appeal is still pending in the Supreme Court of the state.

Plaintiff further alleges that the land herein question is the western 40 acres of that part of section 47, township 9 S., range 2 W., known as the "Latreille tract"; that the Houssiere-Latreille Oil Company, asserting title thereto under conveyances from Latreille, executed and recorded long after the making and recording of the contract here sued on, and availing itself of the pending injunction, has taken possession of said land, and is now, with its assigns, aiders, and abettors (the Rayne Planters' Oil & Development Company, Sharp Bros., John W. Champion, J. B. Newton, J. P. Smith, John C. McCullough, John Brown, Jim Tierce, J. B. Flynn, Tom Smith, the Moonshine Oil Company, the Texas Company, the Producers' Oil Company, Rev. Francis Rouger, and the Rex Oil Company), engaged in drilling wells, and, as plaintiff is informed, has obtained at least 2,000,000 barrels of oil, of which, with its aiders and abettors, it has converted and appropriated 1,000,000 barrels, leaving 1,000,000 barrels on hand, and that, for the preservation of its rights in the premises, writs of injunction and sequestration should be issued. Wherefore plaintiff prays that a writ of injunction be issued and maintained, restraining the parties named.

from further trespassing upon the property described, and that it have judgment recognizing and enforcing its rights under its contract and awarding it certain damages. In accordance with this prayer a preliminary injunction was issued, which was dissolved, on bond, at the instance of the principal defendant, and a writ of judicial sequestration was issued, under which a large quantity of oil was seized by, and is now in the custody of, the sheriff.

The defendants filed various pleas and exceptions, which were overruled, and now rely upon the following defense, as set forth in the answer and amended and supplemental answers of the Houssiere-Latreille Company, to wit: That said company is the owner of the property in question, having acquired the same, through mesne conveyance and directly, from Arthur Latreille, and is in possesssion of the same; that the contract set up by plaintiff, though never legal or binding, has lapsed, according to its terms, by reason of plaintiff's failure either to drill a well or to make the quarterly payments as stipulated; that said contract "was obtained from Latreille, plaintiff's author, through fraud and misrepresentation, as the parties for whom he signed same imposed upon him by representing that they were in a position to prevent the bringing of the suit of the Corkran heirs, and by further representing that whatever proceedings would be taken by said Corkran heirs would be rendered less inimical if said lease were granted, which representations were entirely untrue, but had the effect of coercing said Latreille into signing said lease"; that S. A. Spencer acquired the lease in question as a speculation, and with no intention of developing the property, and that plaintiff had no other assets than said leases and others of a similar character, and was incapable of such development, and it was only after it found that defendant was moving in that direction that

it made any pretense of drilling for oil; that by the terms of the contract the lessee is not bound to drill for oil, but may hold the property until development elsewhere makes it profitable for it to do so, and that defendant is unwilling to submit its property to the blight of such a contract; that, when Latreille accepted the quarterly payments, he did so with the understanding that the next well drilled in that field would be on his property; that $100, payable on the surrender of the contract, is relatively nominal, and is insufficient to support said contract as a consideration, and that the quarterly payments are "vile," as considerations, "both with respect to the ordinary value of the property at the time of the contract, and its possible oil value then, and its actual oil value since; * * * that the contract is not only unconscionable, because of the insufficiency of the consideration aforesaid, but also because the duration of the delay that may be involved, at the will of the lessee, permits the property to suffer in its oil value, or to entirely lose it—time being an essential factor in the operation under the contract"; that, in the alternative, if said lease be binding, it is a mere servitude, not exclusive, and that defendant should be allowed to establish others of similar character; "that at the date of the alleged contract said property was much sought after by parties interested in the discovery of oil, as the indications upon said property of the existence of oil were very great, and gave great and sudden value to said property by reason of the discovery of oil, shortly before, at Beaumont, Tex.; that the indications which led to the discovery of oil at Beaumont were the same as those upon that property, and that the Beaumont discovery, being the first in this entire section, was the beginning of widespread search for oil, and that property presenting favorable oil indications became valuable beyond all precedent; * * * that the fraud

perpetrated on Latreille consisted, not only in assuring him that his title would be protected, but also in assuring him that oil would be prospected for at once, * * * and that other features of said lease, permitting same to be held without any development, were not known to him to have been inserted in said contract, which was never read over to him, same being written in English, which he understood only imperfectly, and never having been explained to him upon that point in French, which language is exclusively used and understood by him;" that defendants have produced the oil in controversy at great cost, and, in the alternative of its being decreed to belong to petitioner, then that plaintiff should reimburse defendants their actual expenses in the production, preservation, and marketing of the same, which expenses, they allege, amount to $500,000; and they call Latreille in warranty and pray for judgment. Latreille, by way of answer, merely joins defendants in resisting plaintiff's demands.

Early in the trial plaintiff's counsel "objected to any and all evidence going to establish fraud, duress, undue influence, and the like, set up in the pleadings, because, first, the charges of fraud, duress, and undue influence are so vague and indefinite as not to permit the introduction of evidence to prove the same; second, conceding, for the sake of argument, that the contract is fraudulent in that way, the same cannot be attacked now, as the plaintiff is a third party, and is not charged with fraud, duress, or undue influence, and is holder for value of the contract rights of Spencer—which objection was sustained by the court." Subsequently, however, the following question was propounded, and objection and ruling made, to wit:

"Q. For the purpose, Mr. Latreille, not of proving up any fraud which is alleged to have been committed against you, but merely * * * of sustaining the allegation made by the Houssiere-Latreille Oil Company and by you to the effect that this property had a great oil value at the time of the execution of the contract, I want to ask you why it was, if you consider that your property had the value that you say it had, you signed a contract of that kind? How did you come to sign that contract? The foregoing question is objected to by counsel for plaintiff on the ground that, in the first place, the allegations should not be limited to fraud, but should include duress and undue influence, and for the further reason that it is irrelevant, and is an attempt by counsel to bring out evidence which has been ruled out by the court, under objection made by counsel for plaintiff, which objection is overruled by the court; the court limiting the evidence to the question of value only, which is now before the court, and not for the purpose of proving fraud, duress, or undue influence. To which ruling of the court counsel for plaintiff excepts," etc.

Under this ruling Houssiere and Latreille were enabled, as witnesses for defendant, to testify, practically without restriction, not only as to the facts connected with the negotiation and making of the contract sued on, but as to their understanding of what the written instrument signed by Latreille contained and as to the feelings which influenced him to sign it. As their testimony was not, however, offered for the purpose of proving the fraud and coercion alleged by defendants, plaintiff did not consider it worth while to offer evidence in rebuttal, so that, quoad those allegations, the evidence gives only the defendant's version of the matter—offered and admitted merely to show the value of the property, as compared with the consideration, and thereby make it appear that the contract was and is unconscionable, to the prejudice of defendants.

Considering all of the evidence adduced, we find the facts to be as follows, to wit:

Eugene Houssiere and Arthur Latreille are brothers-in-law, and are such good friends that they practically hold their property in common and act in concert in all matters of the slightest business importance; the transaction out of which this litigation arises having been dealt with from the beginning as a matter in which they were and are equally interested. They came from France in 1883,

and, after spending a year in Chicago, removed to Louisiana, where, in 1892, they purchased, partly on credit, from Jean Gay, the south three-fourths of section 47, township 9 S., range 2 W., in the parish of Acadia; Latreille taking the upper, and Houssiere the lower, half of the tract so purchased. The upper quarter of the section of which the tract forms part was (in 1901) owned by Laurent Arnaudet (all of which will be better understood by reference to the subjoined plat A, which is an excerpt, approximately correct, from a large plat found in the transcript). The whole of the section in question had been adjudicated in 1882, by C. C. Duson, tax collector, to Henry Gellert, for taxes assessed to Anthony Corkran, or his heirs; and the parties holding under Gellert, including Houssiere and Latreille, as we understand the matter, in 1892 found themselves involved in litigation with certain persons who moved on the property and made application to enter the same under the homestead laws—the theory propounded being that Corkran's title rested upon a located, but unconfirmed, private claim, and that at the date of tax sale the land had not been segregated from the public domain. This litigation resulted in favor of the Gellert title, and subsequently the homestead entries were canceled by the register and receiver of the United States land office at New Orleans. It appears, however, that the homesteaders, represented by their attorney, Geo. Elms, in February, 1897, appealed from the decision last mentioned to the Commissioner of the General Land Office at Washington, and that the appeal was eventually decided in favor of the appellees. The Corkran heirs, in the meanwhile, had not been heard from, and the validity of the tax sale, quoad any assault that they might make, had not been tested.

Houssiere and Latreille had directed their attention to the cultivation of rice and the raising, for home consumption, of hogs, chickens, and vegetables. Latreille's tract contained but little land that was adapted to rice culture, and Houssiere had turned over part of his in order to help Latreille out. Together they cultivated about 75 acres, and this with poor success (notwithstanding that they erected an irrigation pump and that at one time Houssiere operated a small sawmill), up to and after the making of the contract here sued on. In fact, it is doubtful whether Latreille had ever, prior to that time, received more than $300 in any one year from his crops, and Houssiere testifies that in April, 1901, their pecuniary condition was poor, and if they had received $50 he would have remembered it. There is nothing in the record to justify the belief that, prior to the date at which the possibility of oil added value thereto, their holdings were worth more than $10 an acre, and it is hardly likely that they could have found a purchaser at $8 an acre. The fixing of that date is, therefore, regarded as a factor in the case.

Oil was "brought in" on the "Spindle Top" field, near Beaumont, Tex. (about 90 or 100 miles from the locus in quo), in January, 1901, and was immediately followed by a speculative excitement in that vicinity, the accounts of which read like those of the "South Sea Bubble"; but that excitement did not at once, or for several months, extend to, or affect values in, the parish of Acadia. It seems, however, that the indications which led to the discovery at Spindle Top consisted of a seepage of gas in proximity, more or less, to a mound, which is situated in an otherwise flat prairie, and, as gas seepage was known to exist in many places in Acadia, Calcasieu, and other parishes in Louisiana, they attracted some renewed attention, and after a few months began to be seriously considered. It had been known for many years that such a phenomenon existed on section 48 (known as the "McDaniel Tract"), adjoining.

## Plat A.

### T. 9. S; R 2. W.

section 47 on the north, and it was also known that there was a mound on Latreille's prairie, some 1,000 or more feet distant from the seepage. About the first persons to act upon the idea suggested by those conditions were S. A. Spencer, of Jennings, and C. C. Duson, of Crowley; the places mentioned being small towns near, though in different directions from, the indications referred to. There were, sooner or later, associated with Spencer, Messrs. Williams, Jaenke, Mehaffey, and Wilkins, and they agreed to operate together in the obtention of land and leases (principally the latter, as no one seemed to care to invest much money in the enterprise), as a basis upon which thereafter to find some one with capital, experience, and courage enough to exploit their holdings at his own expense in the search for oil. This movement seems to have started some time in the month of April, and on the 18th of that month Wilkins, accompanied by George Elms (the person, we take it, whose name has already been mentioned as the attorney of the homesteaders), called on Latreille for the purpose of obtaining a lease, and were unsuccessful; Latreille telling them that he wished to sell, not to lease. On the following day, April 19th, another call was made on Latreille by Mehaffey, also accompanied by Elms, for the same purpose. What interest Elms had in the matter does not clearly appear. It may be that he went with Mehaffey as an interpreter, since he understood French and Mehaffey did not, and it was known that the negotiations would have to be conducted in part with Houssiere, and that he was unacquainted with English. As the contract which was then entered into— being the contract here in question—was signed by Latreille and his wife, of the one part, and Spencer, of the other part, as principals, it would seem that it was Spencer, rather than Mehaffey and Elms, who was willing to pay out the money and assume the risk; but there is no particular explanation

on that point, and, whilst Mehaffey became a member of the firm of S. A. Spencer & Co., to which the contract was transferred, Elms disappears from the scene from the time that it was made. It is shown that upon the occasion to which we are now referring Latreille was paid $50 in cash (instead of $1, as recited in the contract), and we find no reason for doubt that the instrument signed by him, as it appears in the transcript, was submitted to his inspection, was read by him, and, if there was anything in it that he did not understand, that it was fairly explained to him by Elms. In the course of his examination as a witness he was shown the contract between the defendant company (in which he owns 300,000 shares and of which he has been an active officer since its organization) and another company, and was cross-examined as follows:

"Q. You have read the first provision of the contract? A. Yes, sir. Q. Do you understand the first provision of the contract? A. Not all of it. Q. Now, what part of this first part of the contract is it that you do not understand? * * * A. I understand all the first paragraph, except one word. Q. Now, read the second paragraph, and tell me how much of it you understand? A. I understand about all of it. Q. Now, read the third paragraph and tell me what part of it you understand. A. I understand about all of it. Q. Is this all of the contract between Houssiere-Latreille Oil Company and the Rayne Planters' Development Company? A. I think so."

It is an admitted fact that Latreille could read, write, and speak English in 1901 (though imperfectly), and it appears that it was fully explained to him and Houssiere that the lessee under the contract which was then made was to begin operations within six months, or pay $50 quarterly in advance for each three months that such operations should be delayed. He and Houssiere say that they were told that the first well would be drilled on the Latreille tract; but Latreille says, at another time, that he was told that the first well would be drilled on the Clement tract, and the next well on his tract. The contract is silent on that subject, and

Latreille never demanded as a right that drilling should begin on his land. He testifies that he made requests to that effect and that he received promises, but not from any one authorized to represent the plaintiff, and, being asked whether he made such requests every time he received his rental, he answered, "No, not every time." And yet he received the rental only three times, so that his requests were not as frequent as counsel would seem to think.

Latreille and Houssiere tell different stories as to what Elms said about the Corkran claim, though they agree that he had apparently abandoned his effort to obtain a lease and was getting his horse to leave, when they called him back and, after consultation with each other and with Madame Latreille, signed the lease, for which action Latreille, in his testimony, gives the following reason, to wit:

"A. I was kinder forced. Q. In what way? A. Mr. Elms told me that, if I did not sign the lease for the 40 acres, he would do as Mr. Duson had done about the Corkran heirs, and buy their interest and attack my title. Q. Now, how and why were you influenced by such a threat, coming from Mr. Elms? A. Because they were attacking on two sides of the title, and Elms told me that they had some good lawyers, and they would defend the title."

Houssiere having testified, at considerable length, about Latreille's reason for signing the contract and about what had been said by Elms, and not having referred to the Corkran claim, counsel for defendants finally called his attention to it as follows:

"Q. Then the Corkran suit was not discussed on that occasion, as one of the considerations of the contract? A. Yes, sir; it had been talked of a few days before that by Mr. Pavy. Q. Then Mr. Elms said nothing about it? A. Yes, sir; he did. Q. In what connection? A. He said: 'You know, I always told you that the Gellert title was not worth anything, and I can prove it, and if you gentlemen will give me a lease I will buy out the heirs, who are going to proceed against you.' Q. What was said to that proposition? A. When Mr. Elms started off, and when he was catching his horse, we went and called him back. Q. Now, Mr. Houssiere, what was the main inducement to your signing the contract, considering all that was said? A. It

was to get some wells. Q. Although you wanted some wells, what would have been your answer to Mr. Elms if he had said nothing about the Corkran suit? A. We would not have leased to him at all. We wanted to sell."

It appears that about—or, as we think, before—that time Latreille had been advised by a prominent lawyer in a neighboring town that his title would be stronger after the 12th of May, then approaching, at which date the period of three years required for the prescription established in favor of tax titles by article 233 of the Constitution of 1898 was to be completed; that he had been visited by P. J. Pavy, who desired to obtain a lease, but was unsuccessful; that Pavy knew of the Corkran claim, and perhaps had some connection with the Corkran heirs, and had spoken of the possibility of a suit in their behalf; that C. C. Duson had called and made propositions about the land; that Duson was a member (nominal, it is said) of the firm of W. W. Duson & Bro., which at that time represented some of the Corkran heirs; that he, too, mentioned the possibility of a suit in their behalf; and that Latreille, bearing in mind the advice which he had received, temporized with him—requested him to call again—and in the meanwhile, and after making the contract with Spencer, absented himself from his home until after the 12th of May, when he declined Duson's proposition. It further appears that in the fall of 1901 suit was brought on the Corkran claim for the recovery of the whole of section 47; that S. A. Spencer & Co., to whom S. A. Spencer had transferred his lease, appeared by counsel and defended it, not as a matter of obligation to Latreille, or because of any request from him, but for the protection of their own interest. In fact, it somewhere appears that Houssiere, Latreille, and Arnaudet conveyed a one-fifth interest in their lands to the able counsel by whom they were represented, as compensation for professional services in that litigation, and possibly in

other matters, and it nowhere appears that they ever called on Spencer & Co. to assume any part of that burden. Incidentally, it may be said, that one of the grounds upon which this court decided the Corkran suit in favor of the defendants was that it had not been instituted prior to the 12th of May, 1901 (Corkran Oil & Development Company v. Arnaudet, 111 La. 563, 35 South. 747); that the judgment so rendered did not become final until some time in January, 1904; and that the matter was then taken by writ of error to the Supreme Court of the United States, where it was pending long after the institution of the suit now before the court. It is said that Houssiere and Latreille did not know until 2½ years after it had been made that the contract sued on has a term of 10 years. They, however, had a fair opportunity of obtaining that information before signing the instrument in which it is contained, and it does not appear that, prior to the trial of this case in 1905, they ever let the lessee know that they had not obtained it, or ever complained that they had been led into a contract in ignorance of its conditions.

What followed the making of the contract is told by Spencer in his testimony, to wit:

"A. After the leases were taken, we spent about $2,000 more, and we paid our different proportions, and then, as we were not oil men, we decided to see if we could not interest some parties in Beaumont in the hold we had, and Mr. Williams and myself went to Beaumont, and the first oil man we met was Mr. Scott Heywood. They were very successful men, had operated successfully at Spindle Top, and they were prominent and attracted our attention. We met him at the hotel, and told him we had acquired by purchase leases of large tracts of land —between 4,000 and 5,000 acres—in Acadia parish, on what they call 'Mamou Prairie,' and which had a gas seepage on one place which, for certain tests, had gotten certain results, and, judging from what we read in the papers about the Beaumont, or Spindle Top, oil field, there were indications that would induce practical oil men to come in with us. He agreed to come to Jennings and look the territory over, and in a week or ten days after the talk in Beaumont he came, and we took him out to the place and showed him the gas seepages. He took some notes as to what our holdings were and then went back to Beaumont. I do not remember whether he came back to Jennings, or we went to Beaumont; but I think we went to Beaumont, and then we had a talk with Mr. Scott Heywood and Mr. Dewey Heywood, and we entered into a contract with myself and associates and themselves at Jennings, in which they agreed to drill two wells on our holdings, at a depth of 1,000 feet, in consideration of our transferring to them one-half interest in our holdings, and after the drilling of the two wells they would drill a third well before they would be released from their contract. That is my recollection of it now. I have not seen the contract for three, four, or five years. The agreement arrived at between myself and associates and Heywood Bros., or rather with Scott Heywood, was satisfactory to us, and after some delays they got their machinery on the grounds and began drilling, and after getting down the required 1,000 feet we only had a little showing for oil, and to us inexperienced people it looked rather gloomy, and the question came up as to where the next well would be drilled, and, if I remember right, I think the Heywood Bros. agreed to put the second on top of the first, to give the land a good test, if we would agree to release them from putting down the third well. That looked fair to us, and they went ahead, and finally brought in the first well, at 1,790 feet. It was 1,790 and some odd feet, I believe. * * * Q. When, if at any time, was there excitement at Mamou, or at Jennings, with reference to the Jennings oil field? A. Never, until after that first well was brought in. Understand, of course, that there was, naturally, a little excitement among our local people, and a few outsiders came in after reading in the papers of the gusher, and we—the citizens of Jennings—rather helped along the newspaper notoriety. It was to our interest to do so."

The oil seepage was in the southwest corner of section 48, and as the Arnaudet tract lies between that section and the Latreille tract, whilst the Clement tract adjoins section 48 on the west, the drilling was prosecuted on those tracts first, as being nearer to the point at which it was supposed the oil would be found. Before the expiration of six months Latreille was paid the $50 called for by his contract for further delay, and a similar payment was made on or before January 19, 1902. In February, 1902 (the Heywoods having, in the meantime, found oil), the plaintiff corporation was established, and the capital stock, represented by the holdings of Spencer & Co., which were transferred to the corporation, and by the work done

and money invested by the Heywoods, was divided between the Heywoods and Spencer & Co. in accordance with the agreement as set forth in Spencer's testimony. Following that, on or before April 19, 1902, Latreille was paid a sum of $50 for a delay of three months ending July 19th. Upon the latter date, however, a fire was raging in the oil field, and the payment of the rental for the succeeding three months was overlooked, and the amount was not tendered until July 23d, when it was refused, on the ground that the contract had been forfeited by reason of nonperformance; and tenders of quarterly payments subsequently falling due were likewise refused. Thereafter Houssiere, Latreille, and others organized the Houssiere-Latreille Oil Company, defendant herein, and transferred to it the land or mineral rights in section 47, of which they claimed to be the owners, and the company proceeded to lease those rights to the different individuals and corporations joined herein as defendants, and in December, 1903, brought suit against plaintiff, complaining of a disturbance of its possession of the tract of 40 acres covered by plaintiff's lease, with the result that there was a judgment, rendered by this court, to the effect that the company was not in a position to maintain such an action, and that the contract between Latreille and the syndicate (as the transferee of Spencer & Co.) was prima facie valid. Houssiere-Latreille Oil Company v. Jennings-Heywood Oil Syndicate, 115 La. 107, 38 South. 932.

Returning, now, to the consideration of what others were doing, and of the effect, in April, 1901, of the oil movement on the value of Latreille's land: C. C. Duson (who has been mentioned as the tax collector by whom section 47 was sold to Gellert in 1882, and as a member of the firm of W. W. Duson & Bro., which firm founded the town of Crowley and have been engaged in the real estate business at that place ever since) appears to have lived in what is now the parish of Acadia, or in that section of the state, all his life, and from that circumstance, together with his occupations, was particularly well informed in regard to land matters. He does not appear to have been interested in, much less excited about, oil, until some time in April (following the discovery, in January, of oil at Spindle Top). Having then associated himself with a few other citizens of Crowley, including Mr. Toler, Mr. Abbott, and Dr. Martin, they reconnoitered the field at Spindle Top, and, comparing the conditions which they found with those which they knew to exist in Acadia, set about putting themselves in a position to make a profit, should oil be discovered in that parish. Duson's attention was at once (or, perhaps, it would be more correct to say, had already been) directed to the McDaniel tract (section 48). He had purchased that property, some years before, for the Pacific Improvement Company, and W. W. Duson & Bro. were, and had been, the local agents of the owner, and had had it for sale for a long time, subject to the approval of the attorney in fact of the owner, who resided in the adjoining parish of Lafayette, and, knowing of the gas seepage thereon and of the mound on the Latreille tract, he and his associates concluded to buy section 48. W. W. Duson had, however, sold to Welman Bradford, for $200, payable within a short time, the privilege of buying that section at $11 an acre, and Bradford was taken into the association; the understanding being that the associates were to pay the $200, acquire the property, organize a company for its development, and give him (Bradford) oneeighth of the shares as a bonus. For the carrying out of this program it seems to have been found necessary to take in other persons; that is to say, the $200 cash, which was needed, was not exactly forthcoming, and was gathered, in sums of $25, from per-

sons who had not previously been consulted, principally friends of Dr. Martin, who had the matter in charge, after which, on April 11, 1901, the tract, containing 639.45 acres, was purchased for $7,050 (about $11 an acre), of which $1,800 was payable in cash and the balance in one, two, and three years. Duson testifies that he explained the matter fully to the attorney in fact of the owner (who, as we have said, resided, and still resides, in the adjoining parish, and is a most highly respected citizen), and that, with a full understanding of the conditions, that gentleman was of opinion that the sale would be a good thing for his principal. The Crowley Oil & Mineral Company was then formed, with a nominal capital of $200,000, and section 48, together with 10 acres at Anse la Butte, which cost $100, and the mineral rights in 23 acres, at the same place, which cost $1,200, were put into it, at a valuation of $55,000. One-eighth of the stock was then turned over to Bradford; one-half of the remainder was distributed among the promoters, at 20 cents a share (the shares being of the par value of $10); and the balance, less 5,000 (or, possibly, 2,000) shares, was reserved. The promoters then undertook to raise money by a sale of a portion of the 5,000 (or 2,000) shares to the public at 50 cents on the dollar. Being asked: "Was it uphill business to sell stock?" Dr. Martin replied:

"They were not taking in big quantities, and Mr. Crippen and myself decided to ask people to pay for the stock in order to develop our country. That was our understanding. So we went to work and commenced to talk about it on that line, and as soon as we sold 2,000 shares at $5 we would put down a well."

The doctor also testifies that they kept the daily paper pretty well supplied with inspired articles, and his testimony on that subject is corroborated by specimens of the articles referred to, which we find in the transcript. In that way, and by the diligent efforts of some of its members, the company after awhile collected money enough to begin the drilling of a well; but even then we do not discover the existence of any general excitement or enthusiasm. In the course of the drilling one of the holders of the stock gave 800 of his shares to Mr. Pavy in exchange for a tract of land which was valued at $800, and thought that he was getting the better of the bargain by thus disposing of his stock at 10 cents on the dollar (it having cost him only 2 cents on the dollar), and somewhat later, when the money which had been collected gave out, and no oil had been found, the company suspended operations in great discouragement and would go no further until the Heywoods had "brought in" a well on the adjoining tract. Duson, it has been stated, called on Houssiere and Latreille and made propositions which were not accepted. One of the propositions was that they should divide their land into four tracts, and sell him 45 acres from each tract, at $10 an acre; he to undertake to protect them, as to the balance, against the Corkran claim. The other proposition was no better, and need not be stated. He testifies that they were willing at that time (during the month of April) to sell their entire property at $25 an acre, or say $10,000; and Dr. Martin gives testimony to the same effect. They deny this; but they say that Hurtevant, a neighbor of theirs, was going to Beaumont, and that they told him, if he found any one "foolish enough" to give a good price for their property, to let them know, and, upon his asking them what price they meant, they fixed the "foolish" price at $200 an acre. Section 40 (the "King Tract"), adjoining section 47 to the south, was for sale during the whole of the summer of 1901 at $12 an acre. The north one-half of section 41, containing 113.52 acres, was sold to F. S. Spencer on April 12th for $1,740.80, and it is affirmatively shown that, prior to the date at which oil was actually found, no one (save Duson) of-

fered to buy any of the Houssiere and Latreille land at any price, and that no better offer to lease any part of it was made than that of Spencer. When a well had been, or was about to be brought in, the owners received an offer, which was accepted, of $1,-000 for one acre, and $200 was paid to bind the bargain; but when the bidder learned of the Corkran claim he called the trade off and demanded and obtained the return of his money. It is shown that there are many known places, in Louisiana and elsewhere, where there is seepage of gas; that in most instances no attempt at development has been made; and that in other instances the attempts have proved expensive failures. The seepage at Anse la Butte, for instance, is said to be stronger than in the Jennings field, and the Heywoods have spent some $80,000 there in drilling for oil, with the result that at the end of three years (when this case was tried) they were getting about enough of that fluid to supply them with fuel for the engines by which it was being produced. There is seepage at Welsh, and it is said that over $200,000 have been expended there in the search for oil, with no result. There are oil indications at Sulphur, and Mr. Webster, a witness for defendants and a man of means, seems always to have been disposed to hold some land which he owns in that vicinity for all that it might possibly be worth. There has, however, been no successful attempt to develop oil there. Many thousands of dollars are shown to have been vainly spent in the Jennings field, and similar experiences are shown to have been met at Spindle Top and other places. In fact, there is, and there was in 1901, far less difficulty in finding promising places with good indications than in finding people who were, or are, willing to supply the money for their development.

In December, 1903, after the Corkran Case had been decided by this court, the Houssiere-Latreille Company leased the 40 acres in dispute to the Rayne Oil & Development Company; but before that concern got into the field plaintiff had begun drilling a well. The company thereupon instituted what is called the "possessory action," enjoined plaintiff off the property, kept its injunction in force by an appeal from a judgment dissolving it, and under cover thereof made leases to various of the other parties herein made defendants, and among them they have produced a vast quantity of oil, which is now in the hands of the sheriff under writs of judicial sequestration. One of the questions presented in the case is as to the rights of the defendants, should they be dealt with as possessors in bad faith, arising out of the fact that the oil in question has been produced at their expense. The learned judge a quo, though of the opinion that the contract about which the dispute has arisen is unreasonable and unconscionable, and should be decreed forfeited by reason of plaintiff's failure to pay the rental on or before July 19, 1902, considered himself bound by the ruling of this court in the possessory action, and gave judgment, maintaining plaintiff's rights under said contract; distributing the oil on hand (subject to the payment of costs) in the proportions of 12½ per cent. to the Houssiere-Latreille Oil Company, as transferee of Latreille, 60 per cent. of the remainder to the defendants by whom it was produced, respectively, and the other 40 per cent. of such remainder to plaintiff; reserving to defendants the right to remove all their improvements and pipes, if possible; dismissing the suit as to J. C. McCullough and J. P. Smith, who are shown to have no interest; condemning all the defendants, save McCullough, Smith, the Texas Company, and the Producers' Oil Company, for costs; ordering the case to remain on the docket as to the two companies last mentioned, who were not parties to the trial; and directing that

the sheriff hold the oil now in his hands until his costs shall have been paid. From the judgment so rendered plaintiff and the Houssiere-Latreille Oil Company, defendant, prosecute this appeal, and the other defendants have answered, praying the court to reverse the judgment appealed from and give judgment as prayed for by them and the company, appellant, or, if the judgment awarding the property to the syndicate be affirmed, that the court also affirm it in so far as it disposes of the oil, or else that the court so amend the judgment as to allow defendants' claim as producers of the oil, as set forth in the pleadings and evidence.

## Opinion.

In what is called the "possessory action," heretofore decided, it was held that the contract here sued on, purporting to be a lease for a term of 10 years of mineral rights in a 40-acre tract of land in an unproved part of the country, whereby the contractor agrees to commence operations within six months, or pay $50 quarterly, in advance for each additional three months such operations are delayed, until an oil well is completed, and whereby he is given the right to remove his machinery at any time, and to cancel the contract, on payment of $100 at any time, and whereby, in the event of the discovery of oil and gas, the yield is to be shared by the contracting parties in certain proportions, was not void upon its face for want of mutuality or as containing a potestative condition. Houssiere-Latreille Oil Co. v. Jennings-Heywood Oil Syndicate, 115 La. 107, 38 South. 932.

For the purposes of the judgment so rendered it was assumed that there had been no fraud, misrepresentation, or coercion practiced by the defendant (the present plaintiff), and that the contract was no more unconscionable, by reason of conditions not disclosed, than it appeared upon its face. It

has now been shown that Latreille entered into a contract, apparently legal (and which may be called a "lease"), granting to Spencer, the other contracting party (whom we will call the "lessee"), the right upon certain conditions to exploit 40 acres of his land in search for oil and gas, during a period of 10 years or longer, and to enter upon and use the land during that period for that purpose. By the terms of the contract the lessee was authorized, without consulting the lessor, to transfer his rights therein and substitute another person in his place, and acting under that authority, after recording the contract in the public records, he made a transfer such as was contemplated to S. A. Spencer & Co., and the contract remained so recorded for more than 9 months, during which period the lessor made no objection or protest upon any ground whatever, but received from the substituted lessees two payments in cash, made in execution of the contract as written. Thereafter the substituted lessees transferred their rights to the plaintiff, from whom, a month or two later, the lessor received, in further execution of the contract, a third payment in cash; and when, upon the next occasion a payment was tendered, the money was refused, not upon the ground that the contract was illegal, either as to the plaintiff or any one else, but upon the ground that it was forfeited, because, it was said, the tender came too late.

In their attack upon the contract, so made and so partially executed, the defendants do not allege that the plaintiff, as the transferee through mesne conveyance of the original lessee, was a party to or had notice of the fraud, misrepresentation, and coercion said to have been practiced by the latter, and the judge a quo properly excluded all evidence offered in support of the allegations as made on that subject. Fletcher v. Peck, 6 Cranch (U. S.) 133, 3 L. Ed. 162; Harris v. Harris, 109 La. 913, 33 South. 918; Snoddy v. Brash-

ear et ux., 3 La. Ann. 569. Houssiere and Latreille, as witnesses for defendant, were nevertheless, and upon the theory that another purpose would thereby be subserved, allowed to detail all the circumstances connected with, including the representations made prior to and at the time of, the making of the contract, and to state the influence upon their minds of considerations which do not appear, and are irreconcilable with those expressed, in the writing to which the contract was reduced; and, after giving their testimony our careful attention, we find that it fails to sustain the allegations referred to, whether for the purpose for which it was admitted or for any other purpose. To the contrary, it will, we think, satisfy any reasonable mind that Elms took no advantages of Latreille, and attempted to take none; but that the contract was submitted to Latreille for his perusal, and read by him, and was explained by Elms, in French, so far as explanation was thought to be necessary. It is nowhere denied that Latreille read the contract, and it is proved and admitted that he could read and write English, though imperfectly, and that both he and Houssiere could read and write in French. It is also proved that the advice of a competent lawyer was available to them, and that Latreille obtained such advice for the purpose of his negotiation with Duson, and learned thereby that the prescriptive period needed for the protection of his title would be completed on the 12th of May. It is not pretended that they did not know that the lessee had the privilege of terminating the contract upon the payment of $100, and whilst they testify that they made requests, and received promises, that the first well, or the next well, should be drilled on Latreille's land, it does not appear that they ever made such a demand as a matter of right under the contract, or that they ever made it at all of any authorized officer of the plaintiff company, and

Latreille testifies that he did not always make it when he received his rental, although there were but three such occasions. Under these circumstances, considering their admitted knowledge and means of knowledge and the course of conduct pursued by them afterwards, we find nothing to authorize the assumption that they (or Latreille) would (or need to) have signed the contract without knowing what it contained; and, when they say that they did not know that the term was 10 years, we conclude that they mean that they did not understand the stipulation on that subject to be susceptible of the interpretation that the lessee might, at its option and on payment of the rent, delay the actual drilling for oil during that period. Whether one knows of the existence of a particular stipulation in a contract to which he affixes his signature, and whether he and the other contracting party will thereafter agree as to the meaning of such stipulation, are, however, distinct questions. As to the stipulation referred to, we are of opinion, for the reasons stated, that Houssiere and Latreille knew of its existence; and they knew as much of the interpretation that would be placed on it by the courts, in case they should disagree with the lessee, as did the lessee. Whether that stipulation is properly susceptible of the interpretation suggested, and of no other, need not here be determined. It was said by this court, in deciding the possessory action, that the lessee was bound to drill within the term of the contract, or pay $100, or subject itself to an action in damages; but it was not said that under particular circumstances, as, for instance, if it should have been shown that Latreille's land was being drained of its oil by means of wells drilled and operated on adjacent tracts, a remedy might not have been found. It is, perhaps, an implied obligation of the lease that the land and the lines of the lessor should be protected; but

the demand for such protection was not, nor could it have been, and is not, nor could it be, the foundation of the possessory or of the instant suit, since the lessee was actually drilling for oil and protecting the lessor's lines to the best of its ability when the suit first mentioned was begun, and the purpose and effect of that suit was to prevent it from continuing its operations. The charge that Latreille was coerced by any threat made by Elms with regard to the Corkran claim is unsustained by the proof. It is evident that Elms made no such threat, and, if he had, it would have constituted no ground for the setting aside of the contract, since it does not appear that his relation to Latreille was such as to give his threat any particular weight, and he had the right to buy the Corkran claim, if he thought proper, and to inform Latreille of his intention. Nor do we think it established that in obtaining the lease he assumed any obligation towards Latreille with respect to the Corkran claim; for, if he had done so, the obligation should have been incorporated in the written instrument prepared and signed for the purpose of witnessing the obligations agreed on, and Latreille should have demanded compliance therewith when, in December, 1901, suit was brought on that claim for the recovery of the whole of section 47. But the contract is silent upon the subject, and it is nowhere suggested that such demand was made.

As an independent proposition it must be conceded that it is not within the power of the courts to prohibit the owner of land worth $10 an acre from leasing it for 10 years at $5 an acre; and there is no law that authorizes the owner to oust or disturb the lessee's possession during the term of his lease for the purpose of exploiting the land for oil or of selling it at a higher price. If, therefore, Latreille, in the year 1900, had leased his 40 acres to Spencer for 10 years at $5 an acre, he could not thereafter, by reason of the discovery of possible mineral wealth beneath the soil, have canceled the lease. In that case, however, he would have (we will assume, although it is not really so) have acted in total ignorance of such possibility and would have been entitled to sympathy, upon its being afterwards ascertained that he had unwittingly precluded himself for so long a period from realizing a fortune from the leased land. In the instant case it is shown that he acted with his eyes open; that he and Houssiere had for years known of the gas seepage and the mound; that the possibility that the gas indicated oil had been a matter of common conversation; that he knew of the excitement at Spindle Top, where speculators and others, wise and unwise, were buying and selling land at extravagant prices; and he had had one or two offers with reference to his own property. He also knew that there was no gas seepage on his land, and he may have heard that the oil at Spindle Top had not been found under the mound, but at the places where the gas seeped through and elsewhere. And with this knowledge he entered into the contract here sued on, and, whilst reserving the use of his land for all ordinary purposes, secured for himself an annual rental in cash equal to one-half its ordinary value, plus one-eighth of the oil that the lessee, at his own expense, should discover and deliver to him. We are informed by the testimony in the record that there are many tracts of land in Texas, besides Spindle Top, and many tracts in Louisiana, besides the Mamou Prairie, upon which there are gas seepages, and that, whilst upon some of them vast amounts of money have been expended in the fruitless search for oil, no one has as yet been found to exploit the others. Whether it would be wise for the owners of the exploited, or the unexploited, or the partially exploited, tracts to sell them, or to lease them for a term of years, or to lease merely their oil possibilities, are

matters which, under the law, they—the own-ers—alone have the right to determine, and this court is utterly without authority to render a decree which shall, in effect, say to such an owner: "You may not reserve to yourself the ordinary use of your land, and grant to another person the privilege at any time within ten years of exploiting it for oil, unless the consideration shall meet with our approval; and we shall not approve such a contract unless the grantee agrees to pay more than one-half the ordinary value of the land quarterly in advance by way of rental so long as he delays operating, and more than one-eighth of the product in the event of his discovering oil."

It is true our law undertakes to interfere to some extent with the right of the citizen to do as he pleases with his own; but it defines and limits the cases to which such interference extends with great precision. Thus, quoting from the Civil Code:

"Art. 1860. Lesion is the injury suffered by one who does not receive a full equivalent for what he gives in a commutative contract. The remedy given for this injury is founded on its being the effect of implied error or imposition; for, in every commutative contract, equivalents are supposed to be given and received.

"Art. 1861. The law will, however, not release a person of full age, and who is under no incapacity, against the effect of his voluntary contracts, on account of such implied error or imposition, except in the two following cases: (1) In partition, where there is a difference in the value of the portions to more than the amount of one-fourth to the prejudice of one of the parties. (2) In sales of immovable property, the vendor may be relieved if the price given is less than one-half of the value of the thing sold; but the sale cannot be invalidated for lesion to the injury of the purchaser.

"Art. 1862. Lesion can be alleged by persons of full age in no other sale than one of immovables, in which is included whatever is immovable by destination.

"Art. 1863. Persons of full age are relieved for lesion in no other contracts than those above expressed; not even in exchange, which bears some resemblance to the contract of sale."

Construing this law, our predecessors in this court have said:

"The right to rescind a sale for lesion beyond moiety is the only restraint upon the liberty of the citizen to bind himself and his property according to the dictates of his own judgment, and the evidence relied on to establish that right should be peculiarly strong and conclusive." Demaret v. Hawkins, 8 La. Ann. 484; Mayard v. Laporte, 109 La. 110, 33 South. 98.

"Much has been said about the lesion which affects this contract. It is greatly exaggerated in the statement of counsel. * * * But the law is emphatic that lesion, however enormous it may be, has no effect upon the contracts of persons of full age, and under no incapacity, except in certain designated contracts, and this is not one. Civ. Code, art. 1861; 2 Mourlon, p. 553." Prescott v. Cooper, 37 La. Ann. 559.

Article 2464 of the Civil Code provides that:

"The price of the sale must be certain, that is to say, fixed and determined by the parties. It ought to consist of a sum of money, otherwise it would be considered an exchange. It ought to be serious, that is to say, there ought to have been a serious and true agreement that it should be paid. It ought not to be out of all proportion with the value of the thing; for instance, the sale of a plantation for a dollar could not be considered a fair sale. It would be considered as a donation, disguised."

This article is found under the subtitle, "How the Sale is Perfected," and deals with the price as one of the essential elements of that particular contract. It is evident, however, that the contract here in question is not a sale. It is equally evident that, if the remedy given for lesion, in cases of partition and sale, and the rule thus applied to the price, in the latter contract, had been intended to be applied to the consideration in all contracts, the lawmaker would have so declared, and that he would not, in terms, have limited its application, as has been done in the articles cited. From which it follows that mere inadequacy of consideration would constitute no ground for declaring the contract sued on to be of no effect. The learned counsel for defendants, as we understand it, rely upon the doctrine applied by the courts that:

"Where the inadequacy is so gross as to shock the conscience and common sense of all

men, it may amount, both at law and in equity, to proof of fraud, oppression, and undue influence."

Considering the case in the light of this doctrine we are confronted with the facts (which, for the most part, have already been stated), to wit: Latreille's land was worth, for ordinary purposes, hardly $10 an acre, and it is doubtful whether his gross revenue from the whole tract (200 or more acres) had ever exceeded $300. Spencer paid him $50 in cash, and agreed to pay him $50 quarterly in advance (or $200 a year), for the right to drill for oil on 40 acres, and further agreed to deliver to him one-eighth of the oil that might be produced and saved, etc. The fact that Latreille was, in the meanwhile, to retain the possession and enjoyment of the land, save in so far as he might be disturbed by Spencer's operations, and that he would, in any event, whether oil was found or not, receive annually, one-half of the surface value of the tract leased, and give practically nothing in return, was worthy of, and no doubt received, his consideration. The value of the land to Spencer had, however, no such elements of certainty. It depended upon the possibility of his finding some one who would be willing to risk his money in the search for, and who would find, oil; and, as there were gas seepages in many places, those possibilities were not particularly valuable assets, nor did they produce any material effect upon the value of the land, save in the hopes and dreams of the parties immediately concerned. Otherwise that value remained as it had been, and, we apprehend, would have so remained until this day, but for the initiation and prosecution of an actual movement for the discovery of the oil finder, and through him of the oil. The movement initiated by Spencer and his associates and by Duson or Martin and their associates, was, therefore, the cause, and not the effect of and hence preceded, and did not follow, the speculative appreciation in the value of the land; and as it was, even then, altogether uncertain whether oil would be found at all, and where, and whether in sufficient quantities to make its extraction profitable, that appreciation was by no means marked at first, and values fluctuated, with the hopes and fear of the promoters, up to the moment (during the summer of 1901) when the Heywoods actually "brought in" the first well. Whether, then, the consideration which Spencer agreed to give and Latreille to receive was adequate or inadequate, reasonable or unreasonable, was a question the answer to which was to be determined by no definite standard, but depended upon the temperament and habit of thought of the individual to whom it was at that time propounded. C. C. Duson testifies that, about the time that he and his associates bought section 48 (for $7,050), he thought it was worth $500,000. W. W. Duson, his brother, testifies that his opinion, at that time, was that C. C. Duson and his associates were crazy. And C. C. Duson admits that, when the Crowley Company had spent the money collected by it (mainly from the public at large and as the result of inspired articles in the daily paper and appeals to local pride) in drilling a well and had found no oil, it ceased operations, and would probably never have resumed them if the Heywoods had not prosecuted similar work successfully. Webster, also a witness for defendants, testifies that he would not have made such a contract as that sued on with respect to 1,200 acres of land owned by him near Sulphur, where there were oil indications, and which is probably nearer the Spindle Top than is Prairie Mamou; but it is quite certain that if he had done so, and the contract had been executed, in the matter of the quarterly payments, he would, up to the time that he testified, have received some $27,000 in the way of rental, and would, so far as we are

informed, have been about as near finding oil on his land and about as near selling the land at a speculative valuation as he was without such rental. It is by no means certain, however, that the person who might have paid the $27,000 would have found it a profitable investment. There is, besides, a mass of testimony (if it can be so called) in the record, consisting of personal opinions, given on the witness stand in 1905, as to the oil value on April 19, 1901, of the 40 acres of land, and as to the reasonableness of the contract here in controversy; but, whilst we have no reason to doubt the sincerity of the witnesses, none of them were thoroughly informed as to all the factors which properly entered into the determination of that question. Some of them were at Spindle Top at the date in question, and as not one of them appears to have worked in rice fields for nine years, or to have supported his family on $300 a year, or to have been in a poor condition financially, they could not well have seen the matter from Latreille's point of view. Upon the other hand, we do not find that either of them, at that date, invested any considerable amount of his own money in the Mamou oil fields, and we are inclined to agree with the view, expressed by our predecessors in this court, that:

"In appraising the probable value of lands at a past period, it is almost impossible to guard the mind from the influence of those accidental circumstances which have given it its present value. One readily supposes that he would have had the sagacity to forsee those circumstances." Snoddy v. Brashear, 13 La. Ann. 471.

It is again urged (as it was urged in the possessory action) that the $100 that Spencer was to pay in the event of his abandonment of the contract was inadequate as a consideration, and hence that the whole agreement was founded on a potestative condition; and we repeat, what we have already said, that the parties had the right, in making the contract, to fix the terms upon which it might be terminated, just as they would have had the right to fix those terms after the contract had been made. Instead of the $100 as the amount to be paid by Spencer, they might have agreed on $10,000 (which was the amount for which, it is said, that both Houssiere and Latreille were willing at that time to sell all the land they owned), and it could not have been contended in such case that the contract was founded on a potestative condition. The question, then, relates to the amount. The $100 can only be regarded as a liquidation of the damages that Latreille might have sustained in the event of Spencer's abandonment of the contract; but we are unable to discover in what way any damages could have been sustained by such action, since it is hardly to be supposed that the contract would have been abandoned without the drilling of a well, unless it had become reasonably certain that no oil would be found, in which case Latreille would have sustained no damage by the abandonment, and, if it had been abandoned after the finding of oil, he would have regained the control of his land, plus a producing well. The fact is, it was not the abandonment of the contract that he had reason to fear; but he might have been apprehensive that, by holding on to the contract and delaying the drilling for oil, the lessee would prevent the advantageous sale of the land and might allow it to be drained of its oil by wells on the adjacent tracts. So far as the keeping of the land out of the market is concerned, that happens to every lessor who makes an ordinary lease, and it would be rather startling for a court to hold that, because of a speculative rise in the value of leased property, the lessor should be allowed to cancel the lease. As to the danger of drainage, it may be that, in a case presenting that issue, some relief should be afforded; but we do not consider this such a case. Plaintiff held leases (no more favorable to it than the Latreille lease) on the Arnaudet and Clement tracts, both

of which are nearer to the gas seepage on section 48 than is the Latreille tract, and neither of which was involved in any threatened or actual litigation affecting the title; and it began drilling on those tracts because it was considered more likely that oil would be found on them than on a tract which was more remote. Subsequently (after the Corkran suit had been instituted, and after the defendant had taken the position that Latreille's lease was forfeited), plaintiff was deterred from operating on the Latreille tract by the complication of the situation, until it was driven to assume the risk by the action of the defendant company in leasing the property to the Rayne Planters' Oil & Development Company. We find nothing in these circumstances to indicate that plaintiff was acting in bad faith or with any purpose to allow Latreille's land to be drained; nor do we find that there was any immediate danger of such a result—the testimony on that subject being entirely inconclusive. Nor was that the ground upon which the defendant undertook to declare the forfeiture. In fact, as we have seen, plaintiff was actually engaged in drilling a well on the Latreille tract when the possessory action was instituted and it was enjoined from the further prosecution of the work. We are therefore of opinion that the consideration moving towards the lessor was and is amply sufficient, and particularly is this true in view of the aleatory character of the contract; that is to say, of the fact that it is based upon the wholly uncertain event of the finding of oil in a field from which no oil had ever before been produced. Beale v. Ricker, 7 La. Ann. 667; Demaret v. Hawkins, 8 La. Ann. 484; Prescott v. Cooper, 37 La. Ann. 559; Parker v. Talbot, 37 La. Ann. 22; Linkswiler v. Hoffman, 109 La. 947, 34 South. 34; Copley v. Flint & Cox, 16 La. 380.

The proposition that the contract was forfeited by reason of the failure of the lessee either to begin operations or to make the quarterly payments prior to July 19, 1902, is untenable. The contract contains no provision for its ipso facto forfeiture in the event of such failure, and the law does not favor forfeitures and does not impose that penalty in a case of this kind. The violation having been passive, it was necessary that the obligor should have been put in default. Civ. Code, arts. 1912, 1913, 1926, 1931, 2046, 2047; Charpaux & O. Vallette v. Bellocq, 31 La. Ann. 164; Gayden v. Railroad Co., 39 La. Ann. 269, 1 South. 792.

The Supreme Court of Indiana, whose jurisprudence is about as favorable to the lessor as any that we find, had presented to it, during the past year, a case in which the lease was founded on a consideration of $1, coupled with an agreement to drill a well within two months, "or thereafter pay * * * in advance * * * for further delay a quarterly rental of $20"; there being no term fixed in the lease, and it not appearing, from the report of the case, what the other stipulations were. The lessee had made five quarterly payments, which had been received without objection, but had omitted to make the sixth payment within the time prescribed; and ten days later, no tender of payment having been made and no work having been done in the meanwhile, the lessor brought suit for the forfeiture of the contract. In disposing of the case the court said (inter alia):

"There are many things to be taken into account in arriving at a fair and rational construction of a contract like this. The usual rivalry in procuring leases in the limited oil and gas territory, the time and expense required in drilling wells, the peculiar character of the fluids, the difficulties and delays in providing pipe lines, and the methods of storage and transportation, are all matters generally present at the making of such a contract. Besides, without a market, the operator can ill afford, and it will avail the landowner little, to put down a well before transportation lines have approached within accessible distance. * * * Under a contract of this sort parties must act fairly with each other. The landowner must be given a

fair opportunity to compel such timely operation as will preserve the underlying oil and gas and prevent it being mined through wells on other premises, while, on the other hand, he will not be permitted to take advantage of delays that have been reasonably induced by his own conduct and force forfeiture for nonperformance. The operator must have a fair chance to perform his contract. He has not had a fair chance in this case. If appellees, when they accepted the advance payment on March 10th, or at some other reasonable time, had given appellants notice that they must drill a well within that quarter and that no further extension of time would be granted, then we should have quite a different question. This action, however, is brought and prosecuted upon the theory that the failure to drill a well within the paid period put an end to their right to drill one at all. This view is erroneous." New American Oil & Mining Co. v. Wolff (Ind. Sup.) 76 N. E. 255.

In National Oil & Pipe Line Co. et al. v. Teel et ux. (Tex. 1902) 67 S. W. 545, the Court of Civil Appeals of Texas held that a contract calling for the drilling of a well within two years, on pain of forfeiture, but that the forfeiture might be averted by annual payments in advance, there being no term fixed, was an option, which might be rescinded by the owner of the land, in the absence of any equities, owing to work having been begun by the other contracting party. In Allegheny Oil Co. v. Snyder, 106 Fed. 764, 45 C. C. A. 604 (Ohio, 1900), the lease read:

"In case no well shall be drilled * * * within two years from the date hereof, this lease shall become null and void, unless the lessee shall pay for the further delay at the rate of $1 per acre, at or before the end of each year thereafter: * * * that the lessee shall have the right, at any time, to surrender this lease for cancellation, after which all payments * * * shall cease and this lease become null and void."

The court said:

"An instrument in such form is more than a mere license. It is a lease of the land, for the purpose and period limited therein, and the lessee has a vested right to the possession of the land, to the extent reasonably necessary to perform the terms of the instrument on his part. * * * It is claimed that the consideration of $1 may support the grant of the 2-year term, but that the privilege of extending the same beyond the term of 2 years is supported by no consideration, and is entirely at the option of the lessee, and before it can become a binding agreement requires an engagement on the part of the lessee to pay the stipulated sum of $1 an acre. * * * We are of opinion that this lease constitutes an entire contract, and that the consideration recited supports, not only the grant of the 2-year term, but as well the privilege of extending the time of drilling, by paying the stipulated price therefor. * * * It is an indivisible agreement. Each part of it must be given effect. It is urged that this construction permits the lessee to hold the territory for the term of 25 years, without drilling or developing the same, paying only the rental of $114 a year, and that this would work great hardship to the landowner. * * * This contract, in view of its peculiar purpose and object, * * * has written into it an implied covenant on the part of the lessee that he will drill and operate such number of oil wells on the lands as would ordinarily be required for the protection of the oil contained on such lands and affords ordinary protection to the lines. This was the holding of the Supreme Court of Ohio; and the lessor is not obliged to let the lessee hold the land indefinitely, but may have an action upon this implied covenant for the proper development of the oil and gas on the premises. * * * It is said that the effect of this construction would be to specifically enforce a contract based upon an entirely inadequate consideration, and that an injunction restraining the parties interested from interfering with the lease held * * * under Snyder will have an effect to specifically enforce that contract. * * * In such cases, mere inadequacy of consideration is no reason for withholding specific performance."

In Guffy v. Hukill, 34 W. Va. 49, 11 S. E. 754, 8 L. R. A. 759, 26 Am. St. Rep. 901, and the Eclipse Oil Co. Case, 47 W. Va. 84, 34 S. E. 923, it was held that by the stipulations authorizing the surrender of the leases at will (and as a matter of fact without the payment of any sums of money by way of liquidated damages or otherwise) the obligations of the lessees became (in effect) purely potestative, and hence that the contracts were void. In Friend v. Mallory, 52 W. Va. 53, 43 S. E. 114, the same court sustained a contract containing a similar stipulation, distinguishing the two cases above mentioned by the fact that in those cases the amounts agreed on as consideration for the delay in beginning operations had been paid, and the delay thus paid for had not expired when the lessor acted.

In Leatherman v. Oliver (1892) 25 Atl. 309, 151 Pa. 646, it was held that:

"Under an oil lease for a term of years, which provides that the lessee shall complete a well on the leased premises within six months or pay an annual rental until he does so, a clause in such lease providing that the agreement shall be void if the lessee does not complete the well or pay the rent within ten days after it is due, and that after such failure neither party shall have a right of action against the other by reason of the breach of any agreement in the lease, does not take away the lessee's liability to pay the rent, where he fails to complete the well, but such clause constitutes merely a provision by which the lessor can forfeit the contract on the lessee's failure to comply with the other terms of the lease."

We have examined many other decisions, rendered by courts to which oil leases have long been familiar, and have found none in which a lease such as is here presented has been held void for want of consideration, or decreed forfeited under circumstances such as are disclosed by the transcript in this case.

In conclusion, we may observe that whilst, by reason of the manner in which the case has been presented, we have been led into rather an extended review of the facts, we are inclined to think that, save as to the alleged forfeiture, the whole matter was logically disposed of in our affirmance of the ruling of the trial judge excluding the testimony offered in support of the charge of fraud, etc., since it has heretofore been held that, prima facie, the consideration of the contract is adequate, and its inadequacy, as affected by the facts existing at the time that the contract was entered into, falls under the ruling to which we have referred. In the branch of this litigation entitled "Jennings-Heywood Oil Syndicate v. Houssiere-Latreille Oil Co.," 116 La. 1058, 41 South. 255, it was held that:

"The syndicate's right of possession attached to the oil as a product of the soil, * * * and the operating expenses should be deducted from the proceeds of the well."

The learned judge of the district court has directed that, subject to the payment of the costs, the oil which has been produced by the defendants (save the Texas Company and the Producers' Oil Company) be distributed in the proportion of one-eighth to the Houssiere-Latreille Oil Company, as the transferee of Latreille, 60 per cent. of the balance to the producers, respectively, and the remaining 40 per cent. of such balance to the plaintiff. We find a paragraph, at the end of one of the briefs filed on behalf of plaintiff, rather objecting to this distribution, and, on the other hand, counsel representing the Moonshine Oil Company (one of the producers) have filed a brief praying that (in the alternative) the judgment appealed from be affirmed in that particular. The judge a quo correctly proceeded upon the theory that plaintiff is to get the oil, less the royalty of one-eighth and less the cost of production, and has, as we understand it, fixed upon 60 per cent. of the remaining 87½ per cent. (or 52½ per cent. of the whole product) as fairly representing that cost. We do not, at present, discover any objection to that disposition of the matter, and, as no specific ground of objection has been suggested, it will remain undisturbed.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be affirmed, and that the costs of the appeal be equally divided between the two appellants.

NICHOLLS, J., takes no part not having heard the argument. PROVOSTY, J., concurs in the decree.

## On Rehearing

PROVOSTY, J. The bringing in of an oil gusher at Beaumont, Tex., created a great deal of excitement at all places within a radius of 100 miles where any surface indications of oil, such as gas seepage, were found. Especially was this the case at Prairie Mamou, in the neighborhood of the towns of Jennings and Crowley, La., about 90

miles from Beaumont, where conditions very similar to those of the celebrated Spindle Top were observed—strong seepages of gas in the proximity of a mound. On a match being applied the gas would blaze and explode. These indications were on the southwest corner of the McDaniel tract and the northwest corner of the Corkran tract, which borders the McDaniel tract on the south, and also on the east border of the Clement tract, adjoining the other two tracts on the west. The northern part of the Corkran tract, that bordering the McDaniel tract, was owned by Arnaudet; the middle part, by Latreille; and the southern part, by Houssiere. The Arnaudet holding is approximately 900 to 1,000 feet broad, so that the Latreille land is approximately that distance from the McDaniel tract. As already stated, the Latreille land adjoins the Clement tract. The first wells that were brought in were 1,000 and 100 feet in distance, respectively, from the Latreille land; the former on the McDaniel tract, and the latter on the Clement tract.

C. C. Duson says:

"After the discovery of those indications the excitement was great."

The same witness, who is a very successful business man, says that when he visited the spot, and saw the indications, he "went wild over it." He and his brother, W. W. Duson, another very successful business man, bought the McDaniel tract, in association with others, for the purpose of exploiting it for oil. This was on the 11th of April, eight days before the contract involved in this case was entered into. On the preceding day the local paper had published an editorial with the following headlines:

Gas Discovered in Acadia.

"Gas has been Struck in Acadia—Found in Lower Mamou Prairie, and in Ebenezer Neighborhood—Parties are Purchasing Lands—Every Indication Points to the Finding of Oil if the Land is Developed."

The purchase of the McDaniel tract was heralded in the local paper of the same day, the 11th, under the following headlines:

"Oil Prospectors Buy Acadia Land.

"Where Gas was Struck in South Mamou Prairie, Deal Closed This Afternoon, and a Complete Inspection will be Made—Who the Purchasers Are."

On the next day the local paper published an article under the following headlines:

"Oil Talk From Different Sources.

"It is the Principal Topic of Conversation in Crowley To-Day—What the Oil Experts Say Concerning the Gas Strike in Mamou Prairie—Standard Examines Texas Oil."

W. W. Duson says that by the time the act of sale to the McDaniel tract was recorded "it was pretty hard to know what value was in that section—the jump was so great." The same witness was asked:

"In April, 1901—at that time you had no idea what the land was worth? A. No, sir; speculatively it was worth something. We all went crazy.  *  *  *  I thought most of my co-proprietors were insane. They were worse than any I ever saw in my life."

The men who are thus described by their associates as having gone "wild and crazy" were the substantial business men of the neighboring towns.

Latreille shared in this excitement, and in the dream of sudden wealth from the oil beneath his land. Some time before the signing of the lease, when a special excursion was being run to Beaumont to afford the people of Jennings and Crowley and neighborhood a chance to see the great Lucas well spout oil, one of the excursionists, a Mr. Hurtevant, asked Latreille what price he would ask for his land in case some one was found at Beaumont wanting to buy it. He answered that he would consult with his neighbors about the price they were disposed to ask for theirs, and give an answer the next morning, when the excursion was to leave. He and his neighbors consulted overnight and

agreed upon $200 per acre, and Latreille fixed that as the price which Mr. Hurtevant should ask. This was for the entire tract of 540 acres, and not merely for the 40 which were eventually included in the lease to Spencer.

S. A. Spencer, with some associates, were endeavoring to secure oil and development leases on the lands in the neighborhood of the surface indications of oil, and did, in fact, secure leases on some 4,000 or 5,000 acres. Such leases were being sought on the lands for miles around. Mr. Bradford, one of the witnesses, says that "the newspapers printed thousands of them, and all of about the same character" as the one in question in this case.

When Spencer approached Latreille for a lease, Latreille had already been solicited in vain by others. Latreille says that pressure was brought to bear upon him to execute the lease, and that he finally consented to do so only as the result of this pressure. Be that as it may, he did execute with Spencer the following instrument, presented to him for signature by Spencer, to wit:

### Agreement

Made and entered into this 19th day of April, A. D. 1901, by and between Arthur Latreille, of the parish of Acadia and state of Louisiana, party of the first part, and S. A. Spencer, party of the second part:

"Witnesseth, that the party of the first part, for and in consideration of the sum of one dollar to him in hand well and truly paid by the said party of the second part, the receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the said party of the second part to be paid, kept, and performed, has granted, demised, leased and let, and by these presents do grant, demise, lease, and let, unto the party of the second part, its successors and assigns, for the sole and only purpose of mining and operating for oil, gas, and laying pipe lines, and of building tanks, stations, and structures thereon to take care of said products, all that certain tract of land, situated in Acadia parish and state of Louisiana, bounded and described substantially as follows:

"West by Jules Clement and Orange Land Company, north by Arnaudet, east by lessor, and south by Houssiere, containing forty acres, more

or less, and being same land conveyed to the first party by Jean Gay, bearing date of ———, reserving, however, therefrom one hundred feet around the buildings, on which no wells shall be drilled by either party, except by mutual consent.

"It is agreed that this lease shall remain in force for the term of ten years from this date, and as long thereafter as oil or gas, or either of them, is produced therefrom by the party of the second part, its successors or assigns.

"In consideration of the premises, the party of the second part covenants and agrees, first, to deliver to the credit of the party, his heirs and assigns, free of cost, in pipe line to which it may connect its wells, the equal one-eighth part of all oil produced and saved from the leased premises; and, second, to pay one-eighth of all the gas from each and every well drilled on said premises, the product from which is marketed and used off the premises, said payments to be made from each well within sixty days after commencing the gas therefrom, as aforesaid, and to be paid yearly thereafter while the gas from said well is so used.

"Second party covenants and agrees to locate all wells so as to interfere as little as possible with the cultivated portions of the farm, and, further, to commence operations on said premises within six months from date thereof, or pay at the rate of fifty dollars quarterly in advance for each additional three months such operation is delayed until such a well is completed, and it agrees that the completion of such a well shall be and operate as a full liquidation of all rental under this provision during the term of this lease.

"It is agreed that the second party is to have the privilege to use sufficient water from the said premises to run all necessary machinery and fixtures placed on said premises, and, further, upon payment of one hundred dollars at any time by the party of the second part, its successors or assigns, to the party of the first part, his heirs and assigns, said party of the second part, its successors or assigns, shall have the right to surrender this lease for cancellation, after which all payments and liabilities thereafter to accrue under and by virtue of its terms shall cease and terminate, and this lease becomes absolutely null and void.

"Witness our hands in duplicate this 19th day of April, 1901,

"[Signed]   Arthur Latreille.
"Ismere Latreille.
"S. A. Spencer.

"Witnesses:
"[Signed]   George O. Elms.
"Eugene Houssiere."

The land embraced in this lease is not the whole of Latreille's land, but only the 40 acres of it in immediate proximity to the oil indications, namely, the northwestern end of the tract.

While only $1 is recited in the contract as

to be paid cash, there was actually paid $50 in cash at the execution of the contract. Spencer transferred the contract to S. A. Spencer & Co., and the latter transferred it to the plaintiff syndicate. No question arises in connection with the transfers. The transferees have stood in the shoes of Spencer, with the same rights and obligations.

The contract thus entered into related exclusively to the mineral wealth supposed to lie within the body of the land. It was not a contract relating to the surface of the land, such as an agricultural lease might be. The object and purpose was that the parties might share the treasure supposed to lie hidden within the body of the land. The owner of this treasure was giving up seven-eighths of it in consideration of the party bringing it out in the early future, within the term specified in the act, and delivering one-eighth of it to him.

For making this contract Spencer copied the form that is given at page 869 of Thornton's Law Relating to Oil and Gas, and, having properly filled the blanks, he got Latreille to sign it. The only change he made was that the obligation of the lessee, according to the form in the book, is "to complete a well," and in the contract it was vaguely stipulated as to "commence operations." The purpose of the change which Spencer thus made from the form as found in the book was, doubtless, to favor himself by relaxing the strictness of his obligation. Instead of having to complete a well within six months, he would only have to begin operations. By beginning operations was meant to begin boring a well, for there is no other way for commencing to operate for oil and gas than to begin to bore a well down to the oil or gas stratum. Latreille is a farmer, a man of very little education, who understands but imperfectly the English language, in which the contract is written; the negotiations being carried on mostly through an interpreter.

At the time this contract was entered into, the Corkran tract, which had been acquired by Arnaudet, Latreille, and Houssiere by purchase at tax sale, was threatened with serious litigation by the former owner. It was this supposed infirmity in his title which Latreille says was held as a club over his head to compel him to sign the lease. After oil had been discovered, the suit in question was brought, and eventually came to this court, and was decided by this court in November, 1903, and from the decision of this court a writ of error was obtained to the Supreme Court of the United States. That litigation is now referred to merely for greater fullness of statement, as it really plays no part in the present case. The plaintiff syndicate urges it as one of the reasons why it delayed beginning operations on the Latreille land; but that excuse cannot be sincere, since the syndicate did operate on the Arnaudet land, which forms part of the Corkran grant and was equally involved in the said litigation. It could play a part in this case only if the syndicate had considered itself bound to begin operations and had really been deterred from doing so by fear of the uncertainty of the title. And even then it is questionable whether the excuse could have availed, since the impendency of the litigation was known to the parties at the time of entering into the contract, and no stipulation was made on account of it for further delay.

Assuming that the present contract relates, not to the surface of the land, but to the fluid wealth supposed to lie hidden within it, the remarks of the Supreme Court of the United States in the case of Twin-Lick Oil Co. v. Marbury, 91 U. S. 592, 23 L. Ed. 331, are apposite:

"The fluctuating character and value of this class of property is remarkably illustrated in

the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for $1,000 as its fair value may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then come in and share the profit."

The following extracts from decisions of other courts are also apposite in the same connection:

"Courts will take judicial notice of the vagrant character of petroleum, and that an oil well will draw its product from an indefinite distance, and in time exhaust a large space." Wettengel v. Gormley, 160 Pa. 559, 28 Atl. 934, 40 Am. St. Rep. 733.

"The nature of oil and gas, the pressure of the superincumbent rock, and the vagrant habit of both fluids, under the influence of this pressure, enter into the contemplation of both parties to such an agreement." Kleppner v. Leon, 35 Atl. 109, 176 Pa. 502.

"The real consideration of the instrument was, not the recited $1, nor the $100 that after two years might be paid in order that they might keep it going from year to year, but the beginning and prosecuting with due diligence of wells for oil or minerals upon the land; in other words, the development of the property for oils and minerals in the near future. This was the clear purpose of the grant." Oil Co. v. Teel (Tex. Civ. App.) 67 S. W. 545.

And in the case of Federal Oil Co. v. Western Oil Co. (C. C.) 112 Fed. 373, the court said:

"Oil leases stand upon quite different ground from leases of other immovable property. The governing principle in gas and oil leases of the character in question is that the discovery and production of gas or oil is a condition precedent to the existence and continuance of any vested estate in the demised premises. Where, as in this case, the only consideration is prospective royalties to arise from exploration and development, failure to promptly explore and develop the demised premises renders the agreement nudum pactum, and works a forfeiture of the lease, for it is of the essence of such a lease that the work of exploration shall be commenced and prosecuted with promptness."

In Martel v. Jennings-Heywood Oil Syndicate, 114 La. 358, 38 South. 256, this court said:

"Running through all the decisions on the subject of oil and mineral leases is the principle that in such contract the real consideration is the development of the property for oil or minerals in the near future."

The following from Bryan on Petroleum, p. 146, is also apposite:

"As will be seen from the examination of the case presently to be made, the trend of the decisions touching question of forfeiture arising out of oil and gas leases has been almost uniformly in favor of the lessor. Generally it is the lessee who is favored, and after a substantial compliance by him with the terms of the contract equity will not regard a technical breach. But with mining leases it is otherwise. This is true, principally, if not entirely, to the nature of the business of mining, and, more specifically, oil mining—to the temptation offered the shrewd operator to purchase at a nominal price the right of developing the lands, the owner of which is ignorant of their real value for any purpose, and then to hold them indefinitely, should it suit their purpose, neither working them himself nor permitting another to do so.

"Of course, it may be said, in a general way, that parties may make any contract which they desire, and, if a lessor should, by way of lease, make his intention clear to grant the oil and gas rights upon his property for an inadequate consideration, the court will enforce it. But the lessee, where the instrument presents a semblance of inequality or unfairness, will find that he has a thorny road to travel before reaching a judicial establishment of his claims."

See, in the same sense, Thornton's Law of Oil and Gas, § 78; Donahue, Petroleum and Gas, p. 201; Steelsmith v. Gartlan, 29 S. E. 978, 45 W. Va. 27, 44 L. R. A. 107; Bettman v. Harness, 26 S. E. 271, 42 W. Va. 433, 36 L. R. A. 566; Parish Fork Oil Co. v. Bridgewater Gas Co., 42 S. E. 655, 51 W. Va. 583, 59 L. R. A. 566; and especially Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320.

Extracts to the foregoing purport could be reproduced here almost without end. We will give one more, from Chief Justice Hadley, in Ohio Oil Co. v. Delmore (Ind. Sup.) 73 N. E. 908, to wit:

"Whether it proceeds from design of crafty speculators in oil and gas leases to enshroud their contracts with doubtful, ambiguous, and absurd provisions, as a means of promoting their interests, or whether it comes from a

custom in the rural districts of employing unskilled draftsmen, it is a notable fact that few subjects of contract contribute to the courts an equal proportion of written agreements for interpretation. The fact is so patent that courts generally, in gas and oil states, have come to place such contracts in a class of their own, and to look critically into such instruments for the real intention of the parties, because it so frequently happens that they cannot, on account of incongruous provisions, be enforced according to the strict letter of the contract. Oil Co. v. Crawford, 55 Ohio St. 161, 44 N. E. 1093, 34 L. R. A. 62. The mutual understanding and intent of the parties as to purpose, scope, and ultimate object to be attained by the contract that inspired and accompanied its execution is controlling, and must be determined, not by detached provisions, but by reviewing the provisions as a whole."

The boring of wells was begun on the McDaniel tract by the Crowley Oil & Mineral Company, its owners, and on the Clement tract by the plaintiff syndicate, on the same day and about the same hour, to wit, on May 4, 1901. The first oil gusher was brought in November or December, 1901.

Just before the expiration of the six months fixed in the contract for the commencement of operations, namely, on October 12, 1901, S. A. Spencer & Co. tendered to Latreille $50, and Latreille accepted same, and gave a receipt reciting that said amount was received "for first quarterly payment in advance for delay in operations as stipulated in contract," etc. On January 16th, following, another similar payment was made and similar receipt executed; and likewise on April 15, 1902. The next payment had to be tendered on or before July 19, 1902, in order to be in time, but was only tendered four days thereafter. Latreille declined it, as being too late, and told the lessee that the lease was at an end. The reason assigned by the syndicate for not having tendered the payment in time was that a fire was raging in the oil field which had absorbed their attention and that they overlooked the payment.

At the time the payments were made wells had been bored and were continuously and rapidly being multiplied on the adjoining tracts, and millions of barrels of oil were spouting out of the land, and of this flood Latreille was getting not one drop. On receiving the payments, he had insisted that the next well should be located on his land, and promises had been made to that effect. At the time the fourth payment was declined, as being too late, there had already been bored between 10 and 12 wells on the adjoining Clement tract and a number on the McDaniel tract. The syndicate continued to make the quarterly tenders, and Latreille continued to refuse to accept them.

The evidence establishes that the supply of oil on one tract of land may be drained through wells on another tract, and that so direct is the connection sometimes that, when air pressure would be applied to the wells on the Arnaudet tract, the effect upon the wells on the Latreille tract would be visible and immediate. Soon after the lease to plaintiff had been declared by Latreille to be at an end, the defendant company was organized; and Latreille sold to it all his land in the Corkran grant, including that which had been leased to Spencer. When the plaintiff syndicate saw that the defendant company, through its lessees, was about to begin boring a well on the 40 acres in question, it slipped a derrick across from the Arnaudet tract, and claimed that under the lease to Spencer it was in possession of the 40 acres. The defendant company then brought against the syndicate the possessory action reported at page 107 of 115 La. and page 932 of 38 South. The questions involved in that suit were possession vel non, and, incidentally, whether the lease to Spencer was, or not, absolutely null and void on its face. The court decided that on its face the lease was valid, and that the syndicate was in possession.

The date at which Latreille refused the tardy tender was 15 months after the sign-

ing of the contract. The date when the plaintiff syndicate made the first move towards executing the contract by slipping the derrick across the line was 2 years and 9 months after the signing of the contract. At the date of the trial of the possessory suit in the lower court there were some 70 wells in the neighborhood of the Latreille land. The plaintiff syndicate had 8 wells within 1,200 feet of Latreille's land.

Pending said suit, the syndicate instituted the present suit. The allegation is that the lease to Spencer is valid, and that the plaintiff syndicate has fulfilled all its obligations under it, and that the defendant company, though its lessees, is trespassing upon the leased premises. The prayer is that the defendant and its said lessees be enjoined from thus trespassing, and for judgment "recognizing and enforcing the rights" of the petitioner under the lease in question.

The contentions of defendant are stated in the brief as follows:

"(1) That the consideration of $50 quarterly for the right to delay operations is insignificant and wholly inadequate.

"(2) That the consideration of $100 for the right to hold the lease without development, and to cancel same at will, is insignificant and wholly inadequate.

"(3) That the contract is unconscionable, as giving something for nothing, as enabling the lessee to speculate with another man's property.

"(4) That the real consideration of the contract is the royalty to the lessor, which royalty may be taken away from him by the surrender and delay clauses of the contract, at the arbitrary will of the lessee.

"(5) That the contract was framed to enable the lessee to await the event of the operations of other parties, and to profit enormously without outlay on the part of the lessee, and was actually held by the plaintiff herein for such speculative purpose.

"(6) That the plaintiff herein took out large quantities of oil from the tracts adjoining the premises leased; that it did not desire to develop the leased premises, as too much production might affect the price of the oil already produced; and that oil taken from the adjoining land was drained from the leased land.

"(7) That the syndicate did not attempt to exercise the right to operate under this contract until after it found that the owner of the land had made arrangements with the Rayne Planters' Oil & Development Company to take the land and operate, when it built a derrick near

the line, and slipped it over on the leased land, and began its operations, thereby forestalling the Rayne Company a few weeks."

The first contention of plaintiff is that the judgment in the possessory action is res judicata of the present suit.

We do not think so. As already stated, the questions in that suit were as to possession vel non, and as to the validity vel non of the contract on its face; whereas, the court is now called upon to pass on the question of the validity and effects of the contract, not merely on its face, but upon the facts, and in the light of all the surrounding circumstances, and is also called upon to pass on the further question of whether the plaintiff has complied with its obligations and is in a position to demand performance from defendant.

The cardinal rule in the interpretation of contracts is to seek the intention of the parties, and when that intention is ascertained to give effect to it. In this case the circumstances attending the execution of the contract leave no room for doubt as to what was the intention of the parties. It was, on the one hand, that Spencer should have the sole and exclusive right to exploit the land in question for oil and gas, and, on the other hand, that he should be under the obligation to do so within the six months specified in the agreement, or within a reasonable time thereafter. Any interpretation of the contract which would defeat that intention is not to be entertained. Especially is it not permissible to put upon the contract an interpretation such as would confer upon Spencer the power to prevent the development of the land for oil and gas, thereby converting the contract, which is professedly for the sole purpose of the development of the land for oil and gas in the early future, into one that would operate in the very opposite direction—into one that would enable the lessee to prevent the development of the land for oil and gas for 10 years.

The circumstances attending the execution of the contract leave no room for doubt that the cause of the obligation which Latreille subscribed was the hope of securing in the early future one-eighth of the mine of wealth which was supposed to be lying underneath the surface of the land. This store of wealth was large enough for him to be content with one-eighth of it. He was willing to relinquish his right to the other seven-eighths to Spencer in consideration of the latter's obligating himself to take the proper measures for delivering the one-eighth to him in the early future. We repeat, this was the intention.

Now, the question arises as to whether that intention was embodied in the instrument which the parties executed for the purpose of evidencing their contract. For making this contract Spencer took out of a law book a form of contract upon which the ingenuity of the most astute legal minds seems to have exhausted itself in seeking to accomplish the impossible task of devising a contract which shall be without mutuality of obligation and yet be valid. He took that superingenious form, and copied it, and filled in the blanks, and presented it to Latreille for signature. He even sought to improve on the ingenuity of the inventors of that form by changing the specific obligation to complete a well into that of merely commencing operations, whatever that might mean—thus seeking to loosen still more, if possible, the already slipping hold on the lessee. This form of contract, concerning the obligations of which no two persons seem entirely able to agree, even after careful study, and over the proper interpretation of which the courts are widely divergent, the plaintiff contends that Latreille understood perfectly well as meaning that Spencer should have the right to himself abstain from developing the land for oil and gas, and keep all others, including Latreille himself from doing so.

The contention is that "ita scriptus est contractus," and that as the parties have made their contract so must it be enforced. The answer is, "Ita scriptus non est contractus," if read as a whole and in the light of the circumstances under which it was entered into and of the plain purpose it was designed to accomplish. True, one clause reads in such a way that, taken by itself, it confers upon Spencer the power to abstain from developing the land for oil and gas and keep any one else from doing so for the 10 years, on paying $50 quarterly; but this clause is utterly repugnant to the express declaration of the contract that it is made for the sole purpose of operating for oil and gas and that the lessee obligates himself to begin operations within six months, and it is repugnant to the true spirit of the contract according to which the delay it speaks of and for which the $50 should be paid should be a delay for which the lessee might assign some good cause. It is for delay in performance of the contract that the $50 payments are stipulated, and not as an alternative performance of the contract.

It is simply impossible to understand by this contract that Latreille was willing to give up his hope of sudden wealth from this mine of oil within his land for the mere mess of pottage of $50 every three months until the land should have been drained of its treasure through the wells on the adjoining lands, when it would be thrown back on his hands, dry as a squeezed lemon, plus $100.

The court takes the same view of the present contract as of the similar instrument in the case of Murray v. Barnhart, 117 La. 1023, 42 South. 489. The court thinks that the evidence which has been taken in this case, and which was not before the court in the possessory action, and could not have been considered even if it had been—and there are several volumes of it—shows that, rela-

tively to the value of the thing which the lease embraces, the $50 paid by Spencer at the execution of the lease, and the $100 which he obligates himself to pay in case he did not fulfill the obligations of the lease, are as insignificant and lacking in seriousness as were the $1 and $2 in the Barnhart Case. The court was led into error in the opinion heretofore handed down by considering the leasing value of the surface of the land for agricultural purposes, instead of its speculative value for oil-mining purposes. The court thinks that what Latreille bargained to get under and through this contract was the one-eighth of the supposed mine of hidden wealth under the surface of the land, and that he would never have consented, and, in fact, never did consent, to bargain away his new-born, surging, and exultant hope of great wealth for any $50 payable every three months for a period of three or four, or possibly ten, years, nor even for the $100 additional.

The real and only consideration of such a contract on the part of the lessee is the obligation to develop; and an oil development lease which leaves the lessee free not to develop on making certain periodical payments is held by the courts to be void for want of mutuality of obligation. Martel v. Syndicate, 114 La. 351, 38 South. 253; Foster v. Gas Co., 90 Fed. 178, 32 C. C. A. 560; Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107; Federal Oil Co. v. Western Oil Co. (C. C.) 112 Fed. 373; Id., 121 Fed. 676, 57 C. C. A. 428; Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320; Brown v. Vandergrift, 80 Pa. 142; Cowan v. Iron Co., 83 Va. 547, 3 S. E. 120; Petroleum Co. v. Coal Co., 89 Tenn. 381, 18 S. W. 65; Oil Co. v. Jennings (C. C.) 84 Fed. 839; Guffey v. Oliver (Tex. Civ. App.) 79 S. W. 884; Marble Co. v. Ripley, 10 Wall. (U. S.) 339, 19 L. Ed. 955; Pipe Line Co. v. Teel (Tex. Civ. App.) 67 S. W. 547.

In vain is the principle which has inspired those decisions sought to be met and circumvented by the stipulation of a paltry sum, such as $1, or $2, or even, in a contract of the magnitude and importance of the one here in question—where the prospect is of thousands of dollars, if not millions, and the actual fixed obligation is of $10,000, or more —by the stipulation of $100.

It is not because of lesion, or of error, that the contract is null. It is not a question of lesion, nor a question of error. Both of these questions presuppose the existence of a contract. It is a question of no contract. Not the presence of lesion or error; but the absence of contract. The only contract which the circumstances called for, which, from the surrounding circumstances and from the instrument taken as a whole, the parties can be supposed to have desired to enter into, was a contract binding Spencer to operate for oil and gas; and if, as a matter of fact, he is not bound to that obligation, then the result, or sum total, is that there is no contract. If I make an agreement with a builder to construct an $8,000 house for me on my vacant lot at his own expense, he to retain possession of the house until the rents have reimbursed him his outlay, and he stipulates the right to be released from the contract on payment of 30 cents, the legal situation is that there is really no contract between us. The stipulation of Spencer to bore a $10,000 well, with leave to be relieved from the obligation on paying $100, is hardly a more serious contract. It is an attempt to bind one party, while leaving the other foot loose.

Be that, however, as it may, under no view that can be taken of the contract can the patent fact be lost sight of that the object and purpose of the contract, the thing concerning which the parties dealt, the thing which Spencer was to do under the contract, the cause of the obligation which Latreille on

his part incurred, was that Spencer should develop the land for oil and gas within the time fixed in the contract.

Now, whether Spencer incurred that obligation absolutely at the signing of the contract, so that the contract became then and there a commutative contract, or whether he merely secured to himself, or purchased, an option in consideration of the sundry small payments which he made and agreed to make, are other questions, and questions which, it must be admitted, present the greatest difficulty.

If he merely secured an option, then, by failing to make the fourth quarterly payment within the time fixed for the exercise of the option, he, or his assigns, forfeited all rights under the contract; and there is an end of the matter. Escoubas v. Petroleum Co., 22 La. Ann. 280. It is clear that if I agree to be bound on the condition, or provided, you do a certain thing within a certain time, for example, if I agree that you shall have the exclusive right to exploit my land for minerals, provided you begin operations within six months, or pay me in advance of the expiration of the six months $50 for a prolongation of the term, and you fail to do the thing thus stipulated to be done, I am not bound. Says Pothier (volume 6, p. 217, § 209):

"Lorsque la condition· renferme un temps préfix, dans lequel elle doit être accomplie, comme si je me suis obligé de vous donner une certaine somme si un navire était cette année de retour dans les ports de France, il faut que la chose arrive dans le temps préfix ; et lorsque le temps est expiré sans que la chose soit arrivée, la condition est censée défaillie, et l'obligation contractée sous cette condition est entierement évanouie."

It would seem to be a plain proposition that if I agree to lease you my house on condition that you pay me the rent in advance, and you fail to do so, I am under no obligation to you.

"An option must be exercised within the time limit, or the right will be lost." 21 A. & E. E.

931 ; Richardson v. Hardwick, 106 U. S. 252, 1 Sup. Ct. 213, 27 L. Ed. 145 ; Litz v. Goosling, 93 Ky. 185, 19 S. W. 527, 21 L. R. A. 129 ; Waterman v. Banks, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479.

If, however, the contract was commutative —that is to say, if Spencer incurred the obligation to develop the land—then the question arises whether the contract did not continue in existence until he or his assigns had been called upon by Latreille or his assigns to fulfill it, or, in other words, had been put in default, and had thereafter failed to perform.

Civ. Code, art. 1911, explains what is meant by the obligee putting the obligor in default. It is to "demand that it [the contract] shall be carried into effect"; i. e., shall be performed. Article 1931 provides that a contract is "violated by not doing what was covenanted to be done, or not doing it at the time stipulated." Now, the question arises: When a contract has been violated by not having been performed at the time stipulated, and the obligee no longer desires that it should be performed, must he, under our law, call upon the obligor to perform it (i. e., do the very thing that he does not want done), or may he resist its performance by the contractor, who has violated his contract, and therefore is in no position to call upon his adversary to perform his? That question would seem to answer itself. It does so, however, only with a qualification. The contractor may have been prevented from executing his contract by some cause which ought to excuse him, which the parties in all probability would have agreed should excuse him in case they had foreseen it. In such a case, the contractor, though he has technically violated his contract, and is therefore technically in no position to call upon his adversary to perform his, yet is equitably still in time, because his delay has a good excuse. In such a case, if the contractee refuses to allow the contract to be perform-

ed, the courts may enforce the equity. This is what article 2047 means when it says that:

"The party in default may, according to circumstances, have further time allowed for the performance of his contract."

Our law enforces no such fanciful notion as that, after a contractor has violated his contract by not performing it "at the time stipulated," the contractee who no longer desires to have the contract performed must call upon him to perform, and that if this is not done the time for performance continues to run indefinitely.

When the time for performance is passed, and neither party says anything about the matter, the presumption is that neither party desires performance, but that both desire that nothing further shall be said about the matter. If, in such a case, the contractee desires that the contract shall be performed, or desires to hold the contractor responsible in damages for future delay in performance, he must call upon him to perform, or, as the expression is, "put him in default," and then "damages are due from the time that the debtor has been put in default." Article 1933.

"Suivant l'opinion la plus répandue la recevabilité de l'action en résolution n'est pas subordonnée à une mise en demeure préalable du débiteur: celui-ci en est suffisamment averti par la citation en justice." Dalloz, C. C. Annoté, art. 1184, No. 65—citing a long list of authorities.

That is to say, when the contract has been violated by the thing covenanted to be done not having been done within the time stipulated, the contractee acquires the right to have it rescinded, and does not have to call upon the defaulted contractor to perform it. The rationale of the matter is clear. The contractor knows what his contract is. He knows that it is to be fulfilled within a certain time; and if, without good excuse, he fails to perform it, he violates it, and is no longer in a position to call upon his contractee to perform his part.

Article 1912, Civ. Code, in no wise conflicts with what is here said. It is found in section 2 of chapter 3 of the Code, under the rubric "Of the Obligation of Giving." It reads as follows:

"The effects of being put in default are not only that in contracts to give the thing, which is the object of the stipulation, is at the risk of the person in default; but in the cases hereinafter provided for it is a prerequisite to the recovery of damages and of profits and fruits, or to the rescission of the contract."

That article does not say that default is in all cases a prerequisite to the action of rescission (which is the contention now made by plaintiff), but that it is such "in the cases hereinafter provided." Hereinafter, where? In the entire subsequent portion of the Code? No; if that had been the idea, the language would have been "in all cases"; but "in the cases hereinafter provided"—i. e., in this section. This was the view taken by this court in Murray v. Barnhart, supra, cited, and the court adheres to it.

We think that, since Latreille no longer desired that the contract should be performed there was no necessity for him to go through the ceremony of calling upon the syndicate to perform it. Indeed, we think that any call of that kind he might have made would have had the effect of waiving the default of the syndicate and renewing the term of the contract for a time sufficiently long to admit of performance. I cannot call upon my debtor to perform and refuse him the time in which to do so. Article 2047, Civ. Code, provides that rescission may be demanded "by exception"; and that is what the defendant is doing in this case.

Moreover, the sole object of putting in default is to let the obligor know that the obligee desires that he should perform his contract. When, therefore, the obligee notifies the obligor, as was done in this case, that he considers that the contract is at an end and that he will not allow its performance, there can no longer be any question of putting the obligor in default. The sole ques-

-tion must then be whether the obligor will insist upon his rights or will acquiesce in the termination of the contract.

The learned counsel for plaintiff argue that, because damages cannot be demanded for delay in performing a contract, therefore the rescission of a contract cannot be demanded without precedent putting in default. But the two actions are toto cœlo different. The one is predicated on the affirmance and continued existence of the contract; the other, on its disaffirmance and dissolution. Default is a prerequisite only to the demand for future damages; not to a demand for damages in the past. If the contract was of such a nature that the obligee would suffer damages if it were not performed within the time fixed, the damages thus suffered may be recovered without any putting in default. Civ. Code, art. 1933, No. 1. But if time is not of essence, and the thing may be done as well later as at the time fixed, the law, as a matter of equity, requires :as a prerequisite to the action in damages (which is founded on fault) that the contractee notify the contractor that he desires that the contract should be performed at the time fixed. Such a putting in default is purely a technical proceeding, and may take place as well before as after the expiration of the delay for performance. Such an anticipatory notification would be the exact equivalent of a stipulation in the contract that "the party failing to comply shall be deemed to be in default by the mere act of his failure." Civ. Code, art. 1911, No. 1. The contractor would be fully notified that the contractee desired that the contract should be performed within the time fixed.

If it be conceded that originally the contract was alternative—that the syndicate might, at its option, either exploit the land or pay $50 in advance every three months—certainly the latter alternative became forfeited and vanished out of the contract when the syndicate failed to make the payment in advance as stipulated. The contract then remained purely and simply a contract to exploit the land, without any alternative. The syndicate had then no more right to insist upon the alternative which had vanished from the contract than if that alternative had never been in the contract; and when it did so, and persisted in doing so, instead of offering to perform the only subsisting obligation under the contract, it simply insisted upon a right it did not have, and failed to perform the obligation it was under.

It is needless to consider what would have been the situation if the syndicate had insisted that, notwithstanding the forfeiture of the alternative obligation, it had the right to go on and exploit the land, and had offered to do so. Its position, then, might have had equity, if supported by proof that the delay in fulfilling the contract while Latreille was willing and anxious that it should be fulfilled had been from some good cause. The refusal of Latreille to allow the land to be exploited might then possibly have been an excuse for not executing the contract. But the syndicate made no such tender of performance. On the contrary, it insisted that it was under no obligation to perform, but could hold the land undeveloped for ten years by making the quarterly payments. And by the latter contention it must stand or fall; and it falls.

That such an option is in the nature of a suspensive condition or condition precedent is clear. It is an agreement that an obligation shall come into existence upon the happening of a certain event, or provided a certain event happens, namely, the payment of the $50 in advance. The payment not having been made as thus stipulated, the obligation vanished.

From Pothier, Obl. vol. 1, No. 224, we transcribe and translate the following:

"This difference between resolutory conditions and the suspensive conditions spoken of

in the preceding article may be illustrated by the following example: You agree to lend Peter by my orders the sum of 1,000 francs, if I engage to return it if such a ship, on which he holds a bottomry interest, arrives safe. This is a suspensive condition, and I am not your debtor until the condition is accomplished by the arrival of the vessel; but if I engage for Peter until the arrival of the vessel, but upon condition that my obligation shall only continue until the arrival of the vessel, the condition in this case is only a resolutory condition, which does not prevent my engagement from being perfect immediately upon its being contracted, and consequently you may immediately demand the payment of the money. All the effect of this condition is that, if the vessel arrives before I have discharged or been called upon to discharge my obligation, the accomplishment of the condition puts an end to it."

From N. O. v. T. & P. R. R. Co., 171 U. S. 312, 18 Sup. Ct. 875, 43 L. Ed. 178, we take the following:

"The suspensive condition under the Louisiana Code is the equivalent of the condition precedent at common law.

"The general principles in respect to conditions precedent are set forth sufficiently for the purpose of this case by Chief Justice Shaw, in Proprietors of Milldam Foundry v. Hovey, 21 Pick. (Mass.) 440, cited by appellant: 'Where the undertaking on one side is, in terms, a condition to the stipulation on the other—that is, where the contract provides for the performance of some act, or the happening of some event, and the obligations of the contract are made to depend on such performance or happening—the conditions are conditions precedent.'"

From the French commentators we take the following:

"When the suspensive condition does not happen, the obligation is destroyed, or is considered as never having existed." Toullier, T. 6, n. ——; Aubry et Rau, T. 4, p. 303, n. 75; Laurent, T. 17, n. 106; Larombiere, T. 2, art. 1181, n. 10; Demolombe, T. 25, n. 276.

It stands to reason that an obligation, which is to come into existence or to continue in existence only in case a certain thing is done within a certain time, does not come into existence in case the thing is not done within the time fixed, and that it makes no difference what was the cause why the thing was not done—barring, of course, the acts of the obligee. The French commentators are agreed that in such a case the act of a

third person to prevent the doing of the thing, or even vis major, make no difference:

"C'est en vain que l'un des contractants invoquerait la force majeure ou le refus d'un tiers, pour échapper aux conséquences de l'inaccomplishment d'une condition potestative ou mixte dane le délai fixé." Pothier, Obl. n. 213; Duranton, T. 11, n. 62, et seq.; Rolland des Villargues v. Condition, n. 331; Larombiere sur les Arts, 1116 et 1177, n. 4; Aubry et Rau, T. 4, p. 69, par. 302; Demolombe, T. 25, n. 553; Fuzier-Hermann on article 1117, C. N. No. 3.

See, also, Bach v. Lafayette City Co., 13 La. 549; Chase v. Turner, 10 La. 23; Beal v. McKiernan, 8 La. 572; Collins v. Briggs, 5 La. 256; Kimball v. Breher, 1 La. 211; Thompson v. Moulton, 20 La. Ann. 535.

It follows from this that the prevalence of a fire in the oil field did not have the effect of prolonging the term within which payment was to be made. Such an event could furnish excuse for delaying the performance of a contract, but could not operate for bringing a contract into existence.

We do not think there is any merit in the contention of the plaintiff that the defendant should have tendered back the several small payments made to Latreille. Spencer and the syndicate paid these amounts as the price of the delay which they thereby secured to themselves for the performance of the contract, and, having had the benefit of this delay—that is to say, of the thing for which they made the payments—they are not in a position to demand the return of the payments.

Plaintiff is in reality suing for a specific performance of the contract, and, such being the case, cannot succeed without showing that it has on its part performed the contract. This proof it has failed to make. If the exploitation of the land was the contract, plaintiff has failed to do that. If the payment of $50 quarterly in advance was the contract, plaintiff has failed to do that.

Defendant's claim for damages has not

been pressed, and hence has not been considered.

In further support of the views herein expressed, and for the benefit of the profession as a contribution to a branch of jurisprudence new in this state—that on the subject of oil development contracts—we make part of this decision, by way of appendix, an extract from the very able opinion of the learned trial judge in the case.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that plaintiff's demand be rejected and its suit be dismissed, and the order for injunction herein be set aside, with costs in both courts, and that defendant's reconventional demand for damages be dismissed as in case of nonsuit.

### Extract from Opinion of Trial Judge.

"Were it not for the views expressed by the court in the possessory action, my judgment would be an entirely different one; for all of the authorities in other states in passing upon these oil contracts hold lessees to strict accountability thereunder, and this contract shows upon its face that thereunder everything is absolutely in favor of the lessee and against the lessor. In the first place, there is no express obligation on the part of the lessee to bore although the reading of the contract implies that at least one well must be bored; but thereafter there is nothing in the contract to compel the lessee to bore other wells, even though oil be discovered in paying quantities. Again, the lessee is given the right to hold onto the land, not only for a period of 10 years, but as long thereafter as oil or gas is produced therefrom by the party of the second part; there being even no stipulation that the said oil or gas shall be produced therefrom in paying quantities. In other words, the lessee is given the absolute right to hold the property for 10 years upon boring one well, and as long as the said well produces he can still continue to hold the same property, regardless of the wishes or of the rights of the lessor.

"Again, the lessee, by the payment of an absolutely insignificant sum in so far as oil contracts are concerned, can, if the lease be held good, absolutely withhold the land from the market and prevent its development, provided, however, that at the last moment within the 10 years he bores an oil well on the premises; and then, if oil is found, he can still continue to hold said land. The lessor, who gets $100 in case of surrender and a supposed one-eighth royalty in case of the dis-covery of oil, is absolutely at the mercy of the lessee, who, although the very object of the contract is to bore and develop the property, can pay a small amount and still prevent the development of the land. Again, the poor lessor is absolutely at the mercy of the lessee, for the very minute that the lessee discovers that the adjoining fields do not contain oil he can pay an insignificant sum—the insignificant sum of $100—and absolutely void the contract and all responsibility thereunder.

"The contract, in my opinion, is absolutely unconscionable from a legal standpoint. It confers for a ridiculously small sum an immensely valuable right to the syndicate. It is clearly speculative, made for the purpose of enriching the lessee at the expense of the lessor. He gets nothing thereunder. This contract, under my construction of the law and under the numerous authorities which have been cited, is merely an executory contract, and the construction placed upon such contracts by all the courts in the oil-producing states is that they should be construed strictly; and they hold, as a general proposition, that they are merely options, subject to revocation where no work has been attempted thereunder. Therefore, construing the contract from my own standpoint, I would hold that within the first six months the lessee had a right to bore a well, but, if the same were not completed within the six months, he could, by the payment of $50, continue boring operations; but if, on the other hand, no effort had been made by the lessee to bore within six months, and if, at any subsequent date, the payment which was to secure the extension of the contract for the ensuing three months was not paid in advance, as required by the said contract, this payment being, in my opinion, but a mere option for the extension of time, then the contract would cease to exist by reason of the failure of the party to pay for the extension within the given time. I cannot understand how one party can be given the right to rescind a contract at any time within a period of ten years by the payment of $100, without the other party's having exactly the same right; and it seems to me that the amount of $100, by which the lessee can have the right to retire from the field, is absolutely insufficient and insignificant, and contrary to the very terms of the contract itself. The first part of the contract stipulates that the lessee is to bore one well at least, and yet, by the payment of $100, he can escape the obligation.

"The real consideration of the lease is the royalty to be received by the lessor, and yet the contract may be dissolved at any time by the one party upon the payment of $100. The whole contract, in my opinion, is so drawn that every benefit and advantage is to be derived by the lessee, and all the obligations incurred by the lessor; and while he is promised certain royalties on the one hand, on the other it is taken away from him if the lessee chooses to do so.

"The contract, if held good, undoubtedly enables the lessee to prevent all development on the tract of land in dispute until he can discover whether there is oil in the adjacent fields; and, if there is oil found in adjoining tracts, he has an immensely valuable right, of which he can easily dispose at an immense valuation; and if, on the other hand, no oil is discovered in the adjoining fields, and he finds that it is a barren waste, he bores no well, incurs no obligation, pays $100 to the lessor, and says 'Good-by.'

"Therefore, but for the decision heretofore rendered by this court, I would set aside the contract as speculative in its nature, as absolutely one-sided and unfair to the lessor, who is shown to be an ignorant, uninformed, and credulous Frenchman. I would further hold that the contract sued on is executory in its nature, only giving the right to bore within the first six months, and the right to bore thereafter being optional only upon the strict compliance with the letter of the contract—that is, by the payment of the $50 quarterly in advance; and, as the evidence shows that no boring was done and no payment made in advance for the quarter beginning July 19, 1902, I would set aside said contract. The evidence adduced here convinces me that this contract is a speculative contract, and held by the syndicate for speculative purposes; that it has developed largely the adjoining tracts, deriving an immense quantity of oil as royalties; that it did not desire to develop this particular piece of land for fear of producing too much oil; that oil was being drained from this tract of land by wells on the adjacent tracts; that the syndicate never attempted to bore upon the property in dispute until the Houssiere-Latreille Oil Company had acquired the mineral rights of Arthur Latreille and had entered into a contract with the Rayne Planters' Oil & Development Company, Limited; and that only when the syndicate discovered that the Rayne Planters' Oil & Development Company, Limited, was about to bore upon this tract of land controlled by it, they slipped the said derrick across the line of the land in dispute, thereby commencing operations a few weeks prior to the said Rayne Planters' Oil & Development Company, Limited. Up to that time it had neither bored nor made the slightest effort to bore, so far as the records show, although there is some testimony to the effect that the syndicate did attempt to get others to bore on the field. From April 19, 1901, until December, 1902, the oil had been discovered and a large number of wells bored. Still nothing was done on the tract in dispute. The fact that a suit had been instituted by the Corkran heirs is alleged by the syndicate as one of the reasons for its not having bored; but yet we find on the Arnaudet tract, which was involved in the same litigation, wells were being bored and oil largely extracted therefrom. Equally invalid is the excuse of the syndicate for not making the payment in advance by reason of the fire at the oil field. It was its duty under the law, if it intended to preserve its legal rights, to pay the money within the required time, and the mere fact that the field was on fire would not exonerate it from its failure to do so."

MONROE, J. For the reasons assigned in the original opinion heretofore handed down, as also in the dissenting opinion now handed down by the Chief Justice, I dissent.

NICHOLLS and LAND, JJ., concur in the decree.

For concurring opinion of LAND, J., and dissenting opinion of BREAUX, C. J., see 44 South. 506, 507.